Page 2213

[1] UNITED STATES DISTRICT COURT
  SOUTHERN DISTRICT OF NEW YORK
[2]
[3] UNITED STATES OF AMERICA
[4]        v.        97 Cr. 111(LAP)
[5] WILLIAM P. BRANSTON,
[6]        Defendant.
[7]
[8]            April 28, 1998
               10:15 a.m.
[9]
   Before:
[10]
       HON. LORETTA A. PRESKA
[11]
            District Judge
[12]        and a jury
[13]        APPEARANCES
[14] MARY JO WHITE
    United States Attorney for the
[15]   Southern District of New York
   GEORGE CANELLOS
[16] RICHARD OWENS
   Assistant United States Attorney
[17]
   CHARLES ROSS
[18] STEPHANIE CARVLIN
    Attorney for Defendant
[19]
[20]
[21]
[22]
[23]
[24]
[25]

EXHIBIT 1

Page 2

[1] (Trial resumed)

[2]    (In open court, jury present)

[3]    THE COURT: Good morning. Members of the jury,
[4] we have reached the final stage in these proceedings before
[5] you begin your deliberations. As you know, that stage is
[6] called the court's charge – or instructions – to the jury.
[7]    We have all worked very hard to try to make this
[8] charge as clear and concise as possible, but it is
[9] necessarily still quite long and somewhat complex. So, your
[10] close attention will be appreciated.

[11]    As you can see, I have given each one of you a
[12] copy of the charge and you may take that copy with you into
[13] the jury room. For now, as I read the charge to you, you
[14] may follow along on your own copy or you may put the copy
[15] down and simply listen. The choice is yours.

[16]    I intend to stop for a break at the end of page
[17] 42 another, a short break at the end of page 83, so that you
[18] will not be glued to your chairs for the entire morning.

[19]    The charge does three basic things. First, it
[20] explains certain rules and procedures generally applicable
[21] to all criminal jury trials. Second, it explains the rules
[22] of law applicable to the specific statutes which this
[23] defendant is accused of violating. Third, and finally, it
[24] explains the procedures by which you may ask questions,
[25] request exhibits, and, in general, conduct your

Page 2:

[1] deliberations.

[2]    Let me begin my remarks by thanking you, as
[3] counsel have thanked you, for your patience and your
[4] attentiveness during trial. Having paid careful attention
[5] to the evidence as it was presented to you during the trial,
[6] you are fully prepared to reach a verdict as to whether or
[7] not the government has sustained its burden of proof beyond
[8] a reasonable doubt as to each count against the defendant.

[9]    We have heard all of the evidence in the case as
[10] well as final arguments of the lawyers for both sides. My
[11] duty at this point is to instruct you as to the law. It is
[12] your duty to accept these instructions of the law and to
[13] apply them to the facts as you determine them.

[14]    On these legal matters, you must take the law as
[15] I give it to you. If any attorney has stated legal
[16] principles different from any that I state to you in my
[17] instructions, it is my instructions you must follow. You
[18] should not single out any instruction as alone stating the
[19] law, but you should consider my instructions as a whole when
[20] you retire to deliberate in the jury room. You should not,
[21] any of you, be concerned about the wisdom of any rule that I
[22] state. Regardless of any opinion that you may have as to
[23] what the law may be – or ought to be – it would violate
[24] your sworn duty to base a verdict upon any view of the law
[25] other than that which I gave you.

Page 2216

[1] Your final role as jurors is to pass upon and
[2] decide the fact issues that are in the case. You, the
[3] members of the jury, are the sole and exclusive judges of
[4] the facts. You pass upon the weight of the evidence; that
[5] is, you determine the credibility of the witnesses; you
[6] resolve such conflicts as there may be in the testimony; and
[7] you draw whatever reasonable inferences you decide to draw
[8] from the facts as you have determined them. I will discuss
[9] how to pass upon the credibility – i.e., believability –
[10] of the witnesses a bit later on in the charge.
[11] In determining the facts, you must rely on your
[12] own recollection of the evidence. What the lawyers have
[13] said in their opening statements, in their closing
[14] statements, in their objections, or in their questions is
[15] not evidence. In this connection, you should specifically
[16] bear in mind that a question put to a witness is not itself
[17] evidence. It is only the answer, taken in the context of
[18] the question that was asked, which is evidence. Nor is
[19] anything I say may have said during the trial or may say
[20] during these instructions with respect to a fact matter to
[21] be taken in substitution for your own independent
[22] recollection.
[23] As I told you at the beginning of the trial,
[24] note-taking is allowed. If you took notes, they are to be
[25] used solely to assist you, and your notes are not to

Page 2217

[1] substitute for your recollection of the evidence in the
[2] case. The fact that a particular juror has taken notes
[3] entitles that juror's views to no greater weight than those
[4] of any other juror, and your notes are not to be shown to
[5] any other juror during the course of your deliberations.
[6] If, during your deliberations, you have any doubt
[7] as to any testimony, you will be permitted to request that
[8] the official trial transcript which is being made of these
[9] proceedings be read to you.
[10] The evidence before you consists of the answers
[11] given by the witnesses – the testimony they gave, as you
[12] recall it – the exhibits that were received in evidence,
[13] and the stipulations of the parties.
[14] However, you may not consider any answer,
[15] testimony or exhibits that I directed you to disregard or
[16] that I directed be stricken from the record. If an answer
[17] has been stricken, it must be entirely disregarded as though
[18] the words were never spoken. Similarly, if an objection to
[19] a question was sustained before the witness answered, you
[20] must disregard the question entirely. You may draw no
[21] inferences from the wording of the question nor speculate
[22] about what the witness might have answered.
[23] Your verdict must be based solely upon the
[24] evidence developed at trial or the lack of evidence. All
[25] persons are entitled to the presumption of innocence, and it

Page 2218

[1] would be improper for you to allow any feelings you might
[2] have about the nature of the crime charged to interfere with
[3] your decision-making process.
[4] It would be improper for you to consider, in
[5] reaching your decision as to whether the government
[6] sustained its burden of proof, any personal feelings you may
[7] have about a defendant's race, religion, national origin,
[8] sex or age. All persons are entitled to the presumption of
[9] innocence and the government has the burden of proof, as I
[10] will discuss in a moment.
[11] To repeat, your verdict must be based exclusively
[12] on the evidence or the back of evidence in the case.
[13] Now, because you are the sole and exclusive
[14] judges of the facts, I do not mean to indicate any opinion
[15] as to the facts or what your verdict should be. The rulings
[16] I have made during trial are not any indication of my views
[17] of what your decision should be as to whether or not the
[18] guilt of the defendant has been proven beyond a reasonable
[19] doubt.
[20] I also ask you to draw no inference from the fact
[21] that on occasion I asked questions of certain witnesses.
[22] Those questions were intended only for clarification or to
[23] expedite matters but were not intended to suggest any
[24] opinions on my part. You are expressly to understand that
[25] the court has no opinion as to the verdict you should render

Page 2219

[1] in this case.
[2] You should also note that it is the duty of the
[3] attorneys on each side of a case to object when the other
[4] side offers testimony or other evidence which the attorney
[5] believes is not properly admissible. Counsel also have the
[6] right and duty to ask the court to make rulings of law and
[7] request conferences at the sidebar out of the hearing of the
[8] jury. All those questions of law must be decided by me, the
[9] court. You should not show any prejudice against an
[10] attorney or his client because the attorney objected to the
[11] admissibility of evidence or asked for a conference outside
[12] of the hearing of the jury or asked the court for a ruling
[13] on the law.
[14] This is a portion that is included in the general
[15] charge, but as you will know as I read it, it is not so
[16] applicable here. In some trials the court has to admonish
[17] attorneys because it did not believe that what they were
[18] doing was proper. To the extent it happened here, I cannot
[19] remember that it did, you should draw no inference from that
[20] against them or their client. As I have already told you,
[21] it is the duty of the attorneys to offer evidence and to
[22] press objections on behalf of their side of the case. It is
[23] my function to cut off counsel from an improper line of
[24] argument or questioning and to warn counsel when I think it
[25] is necessary. But you should draw no inference from that.

Page 2220

[1] It is irrelevant whether you believe I like a lawyer or
[2] whether you like a lawyer. The issue before you is not
[3] which attorney is wittier or more likable or the better
[4] attorney – the issue is whether or not the government has
[5] sustained its burden of proof beyond a reasonable doubt. In
[6] addition, you should note that the attorneys themselves do
[7] not have personal knowledge of the facts in the case. Their
[8] role is that of advocates, not witnesses.
[9]     You are to perform your duty of finding the facts
[10] without bias or prejudice to any party. You are to perform
[11] your final duty in an attitude of complete fairness and
[12] impartiality.
[13]     The fact that the government is a party and that
[14] the prosecution is brought in the name of the United States
[15] of America does not entitle the government or its witnesses
[16] to greater consideration than that accorded to any other
[17] party. All parties, whether government or individuals,
[18] stand as equals at the bar of justice.
[19]     The defendant has pleaded not guilty, and thus
[20] the government has the burden of proving the charges against
[21] him beyond a reasonable doubt. This burden never shifts to
[22] a defendant for the simple reason that the law never imposes
[23] upon a defendant in a criminal case the burden or duty of
[24] calling any witness or producing any evidence.
[25]     The law presumes a defendant to be innocent of

Page 2221

[1] all the charges against him. I therefore instruct you that
[2] the defendant is presumed by to you to be innocent
[3] throughout your deliberations until such time, if ever, that
[4] you as a jury are satisfied that the government has proven
[5] him guilty beyond a reasonable doubt.
[6]     A defendant begins a trial with a clean slate.
[7] This presumption of innocence alone is sufficient to acquit
[8] a defendant unless you as jurors are unanimously convinced
[9] beyond a reasonable doubt of his guilt, after a careful and
[10] impartial consideration of all of the evidence in a case.
[11]     I have said that the government must prove a
[12] defendant guilty beyond a reasonable doubt. The question
[13] naturally arises: "what is a reasonable doubt?" The words
[14] almost define themselves. It is a doubt based upon reason
[15] and common sense. It is a doubt that a reasonable person
[16] has after carefully weighing all of the evidence. It is a
[17] doubt that would cause a reasonable person to hesitate to
[18] act in a matter of importance in his or her personal life.
[19] Proof beyond a reasonable doubt must, therefore, be proof of
[20] such a convincing character that the reasonable person would
[21] not hesitate to rely and act on it in the most important of
[22] his or her own affairs.
[23]     The law does not require that the government
[24] prove guilt beyond all possible doubt. Proof beyond a
[25] reasonable doubt is not a caprice or whim; it is not a

Page 2

[1] speculation or suspicion; it is not an excuse to avoid the
[2] performance of an unpleasant duty; and it is not sympathy.
[3]     Let me repeat, however, that is always the
[4] government's burden to prove each of the elements of the
[5] crimes charged beyond a reasonable doubt. The defendant is
[6] under no duty to present evidence or to challenge the
[7] evidence presented by the government. Nor do you have to
[8] accept the testimony of any witness, even one who has not
[9] been contradicted or impeached, if you find that witness not
[10] to be credible. You must decide which witnesses to believe
[11] and which facts are true. To do this you must look at all
[12] the evidence, drawing upon your own common sense and
[13] personal experience.
[14]     If after a fair and impartial consideration of
[15] all of the evidence you have a reasonable doubt as to the
[16] guilt of the defendant, then it is your duty to acquit the
[17] defendant. On the other hand, if after a fair and impartial
[18] consideration of all of the evidence you are satisfied of
[19] the defendant's guilt beyond a reasonable doubt, then you
[20] must vote to convict.
[21]     You are about to be asked to decide whether or
[22] not the government has proved beyond a reasonable doubt the
[23] guilt of the defendant. You are not being asked to decide
[24] whether any other person has been proven guilty. Your
[25] verdict should be based solely on the evidence or lack of

Page 22

[1] evidence as to this defendant, in accordance with my
[2] instructions and without regard to whether the guilt of any
[3] other person has or has not been proven.
[4]     Remember that only this defendant is on trial,
[5] not anybody else, and only for the crimes charged, not for
[6] anything else. You should consider evidence about the acts,
[7] statements, and intentions of others, and evidence about
[8] other acts of the defendant, only as they relate to these
[9] charges against the defendant.
[10]     You may not draw any inference, favorable or
[11] unfavorable, towards the government or the defendant on
[12] trial, from the fact that certain persons were not named
[13] defendants in the indictment or that alleged conspirators
[14] were not indicted. That these persons were not indicted
[15] must play no part in your deliberations.
[16]     Whether a person should be indicted as a
[17] defendant in this case is a matter within the sole
[18] discretion of the United States Attorney and the grand jury.
[19] Therefore, you may not consider it in any way in reaching
[20] your verdict as to the defendant on trial.
[21]     Mr. Branston did not testify in this case. Under
[22] our Constitution, he has no obligation to testify or to
[23] present any other evidence because it is the government's
[24] burden to prove the defendant guilty beyond a reasonable
[25] doubt. That burden remains with the prosecution throughout

Page 2224

[1] the entire trial and never shifts to the defendant. The
[2] defendant is never required to prove that he is innocent.
[3]     You may not attach any significance to the fact
[4] that the defendant did not testify. No adverse inference
[5] against him may be drawn by you because he did not take the
[6] witness stand. You may not consider this against the
[7] defendant in any way in your deliberations in the jury room.
[8]     I have said several times that your verdict must
[9] be based upon the evidence or lack of evidence. Let me now
[10] give you some rules about the various types of evidence and
[11] about how you evaluate the testimony of witnesses. After
[12] that, I will discuss the specific charges against the
[13] defendant and what the government must show in order to
[14] satisfy its burden of proof.
[15]     As you remember from my initial remarks at the
[16] beginning of trial, the law recognizes two kinds of
[17] evidence, direct evidence and circumstantial evidence. You
[18] may rely on either type of evidence in reaching your
[19] decision. Evidence is direct when the facts are shown by
[20] exhibits which are admitted into evidence, or when the facts
[21] are sworn to by witnesses who have actual knowledge of them
[22] from something they have derived from the exercise of their
[23] senses, such as something they heard, something they saw,
[24] something they smelled, something they touched, and so on.
[25]     Circumstantial evidence is evidence which tends

Page 2225

[1] to prove a disputed fact by proof of other facts. You will
[2] remember the example we always talk about. Assume when you
[3] came into the courtroom this morning, the sun was shining
[4] and it was a nice day, as it was. Assume that the courtroom
[5] shades are drawn so you cannot look outside. Assume also,
[6] as we were sitting here, someone walked into the back of the
[7] courtroom with a dripping raincoat and umbrella. We cannot
[8] look outside of the courtroom and see if it is raining, we
[9] cannot stick our hand outside to feel if it is raining, so
[10] we have no direct evidence of whether or not it is raining.
[11] But on the combination of the facts that I have just asked
[12] you to assume, it would be reasonable and logical for you to
[13] conclude that it has been raining or to infer that it has
[14] begun to rain outside.
[15]     That is all there is to circumstantial evidence.
[16] You infer on the basis of reason and experience and common
[17] sense from an established fact – that is, the raincoat and
[18] the umbrella – the existence or nonexistence of some other
[19] fact; that is, that it has begun to rain outside.
[20]     Circumstantial evidence is of no less value than
[21] direct evidence. It is a general rule of law that the law
[22] makes no distinction between direct and circumstantial
[23] evidence, but simply requires that before convicting a
[24] defendant, the jury must be satisfied of the defendant's
[25] guilt beyond a reasonable doubt from all of the evidence of

Page 2226

[1] the case.
[2]     During the trial you may have heard the attorneys
[3] use the term "inference," and in their arguments they have
[4] asked you to infer, on the basis of your reason, experience
[5] and common sense, from one or more established facts, the
[6] existence or nonexistence of some other fact.
[7]     An inference is not a suspicion or a guess. It
[8] is a reasoned, logical decision to conclude that a disputed
[9] fact exists on the basis of another fact which you know
[10] exists.
[11]     There are times when different inferences may be
[12] drawn from different facts, whether proved by direct or
[13] circumstantial evidence. The government asks you to draw
[14] one set of inferences, while the defense asks you to draw
[15] another. It is for you and you alone to decide what
[16] inferences you will draw.
[17]     The process of drawing inferences from facts in
[18] evidence is not a matter of guesswork or speculation. An
[19] inference is a deduction or conclusion which you, the jury,
[20] are permitted to draw – but not required to draw – from
[21] the facts which have been established by either direct or
[22] circumstantial evidence. In drawing inferences, you should
[23] exercise your own common sense.
[24]     So, while you are considering the evidence
[25] presented to you, you are permitted to draw, from the facts

Page 2227

[1] you find to be proven, such reasonable inferences as would
[2] be justified in the light of your experience.
[3]     Here again, however, let me remind you that,
[4] whether based on direct or circumstantial evidence, or upon
[5] the logical and reasonable inferences drawn from such
[6] evidence, you must be satisfied of the guilt of the
[7] defendant beyond a reasonable doubt before you may convict.
[8]     In this case you heard certain evidence in the
[9] form of stipulations of testimony. Counsel on both sides
[10] worked very hard on those; they saved us a lot of trial
[11] time. Remember now that a stipulation of testimony is an
[12] agreement between the parties that, if called, a witness
[13] would have given certain testimony. You must accept as true
[14] the fact that the witness would have given that testimony.
[15] However, it is for you to determine the effect to be given
[16] to that testimony.
[17]     You have also heard evidence in the form of
[18] stipulations that contain facts which were agreed to be
[19] true, such as the fact that particular records are business
[20] records of a particular bank, securities firm or other
[21] entity. In such cases, you must accept those facts as true.
[22]     There has been a great deal said in the openings
[23] and summations of counsel as to whether various witnesses
[24] should be believed. I am sure that it is clear to you by
[25] now that you are being called upon to resolve various

Page 2228

[1] factual issues in the face of very different pictures
[2] painted by the government and by the defense which cannot be
[3] reconciled. You will now have to decide whether the
[4] government has proven guilt beyond a reasonable doubt, and
[5] an important part of that decision will involve making
[6] judgments about the testimony of the witnesses you have
[7] listened to and observed. In making those judgments, you
[8] should carefully scrutinize all of the testimony of each
[9] witness, the circumstances under which each witness
[10] testified, and any other matter in evidence which may help
[11] you to decide the truth and the importance of each witness'
[12] testimony.
[13]     Let me first give you some general guidance about
[14] how to evaluate testimony. After that, I will discuss some
[15] additional issues raised by the witnesses who have testified
[16] in this particular case.
[17]     First, there is no magic formula for evaluating
[18] testimony. You bring to this courtroom all the experience
[19] and background of your lives in your everyday affairs. You
[20] determine for yourselves every day in a multitude of
[21] circumstances the reliability of statements which are made
[22] to you by others. The same tests that you use in your
[23] everyday matters of importance are the tests you use in your
[24] deliberations.
[25]     Your decision whether or not to believe a witness

Page

[1] right to reject the testimony of that witness in its
[2] entirety. On the other hand, even if you find that a
[3] witness has testified falsely or inaccurately about one
[4] matter, you may reject as false or inaccurate that portion
[5] of his or her testimony and accept as true any other portion
[6] of his or her testimony which recommends itself to your
[7] belief or which you find corroborated by other evidence in
[8] the case.
[9]     In essence, what you must try to do in deciding
[10] credibility to size up a person in light of his or her
[11] demeanor, the explanations given, and all the other evidence
[12] in the case, just as you would in any important matter where
[13] you are trying to decide if a person is truthful,
[14] straightforward and accurate in his or her recollection.
[15]     In deciding the question of credibility, remember
[16] that you should use your common sense, your good judgment
[17] and your experience.
[18]     If you find that any witness whose testimony you
[19] are considering may have an interest in the outcome of the
[20] this trial, then you should bear that factor in mind when
[21] evaluating the credibility of his or her testimony, and
[22] accept it without great care. This is not to say that every
[23] witness who has an interest in the outcome of a case will
[24] testify falsely. It is for you to decide to what extent, if
[25] at all, the witness' interest has affected or colored his or

Page 2229

[1] may depend on how that witness impressed you. Was the
[2] witness candid, frank and forthright? Or did the witness
[3] seem as if he or she was hiding something, being evasive or
[4] suspect in some way? How did the way in which the witness
[5] testified on direct examination compare with the way in
[6] which he or she testified on cross-examination? Was the
[7] witness' testimony consistent or self-contradicting? Did
[8] the witness appear to know what he or she was talking about
[9] and did the witness strike you as someone who was trying to
[10] report his or her knowledge accurately?
[11]     How much you choose to believe a witness may be
[12] influenced by the witness' bias. Does the witness have a
[13] relationship with the government or the defendant which may
[14] affect how he or she testifies? Does the witness have some
[15] incentive, loyalty or motive that might cause him or her to
[16] shade the truth? Or does the witness have some bias,
[17] prejudice or hostility that may have caused the witness,
[18] consciously or not, to give you something other than a
[19] completely accurate account of the facts that he or she
[20] testified about? You should also consider the witness'
[21] ability to express himself or herself. Ask yourselves
[22] whether the witness' recollection of the facts stands up in
[23] light of all the other evidence in the case.
[24]     If you find that any witness has willfully
[25] testified falsely as to any material fact, you have the

Page

[1] her testimony.
[2]     You have heard the testimony of certain law
[3] enforcement officials. The fact that a witness may be or
[4] may have been employed by the government as a law
[5] enforcement official does not mean that his or her testimony
[6] is necessarily deserving of more or less consideration or
[7] greater or lesser weight than that of any other witness. At
[8] the same time, it is quite legitimate for defense counsel to
[9] attack the credibility of a law enforcement witness on the
[10] grounds that his or her testimony may be colored by a
[11] personal or professional interest in the outcome of the
[12] case.
[13]     It is your decision, after reviewing all the
[14] evidence, whether to accept the testimony of the law
[15] enforcement witness and to give that testimony whatever
[16] weight, if any, you find it deserves.
[17]     During the course of this trial, you heard
[18] testimony from what the law calls expert witnesses.
[19] Although a witness is generally permitted to testify only to
[20] facts and not to express his or her opinions, the law
[21] permits the opinions of qualified experts on technical
[22] matters. An expert may testify as to his or her knowledge
[23] on a subject about which he or she has special knowledge.
[24] This testimony is permitted on the theory that the advice of
[25] a person experienced in special or technical subjects will

Page 2232

[1] assist you in determining the facts.

[2] In weighing expert testimony, you may consider
[3] the expert's qualifications and opinion and his or her
[4] reason for testifying, if any. You may give his or her
[5] testimony such weight as you feel it deserves. You should
[6] not accept this witness' testimony merely because he or she
[7] is an expert. Nor should you substitute such a witness'
[8] testimony for your own reason, judgment, and common sense.
[9] The determination of facts in this case rests solely with
[10] you.

[11] You have heard the testimony of certain witnesses
[12] who have been promised that in exchange for testifying
[13] truthfully, completely and fully, they will not be
[14] prosecuted for false testimony before the Securities and
[15] Exchange Commission or for certain other conduct. This
[16] promise was not a formal order of immunity by the court, but
[17] was arranged directly between the witness and the
[18] government.

[19] The government is permitted to make these kinds
[20] of promises and is entitled to call as witnesses people to
[21] whom these promises are given. You are instructed that you
[22] may convict a defendant on the basis of such a witness'
[23] testimony alone, if you find that that testimony proves the
[24] defendant guilty beyond a reasonable doubt.

[25] However, the testimony of a witness who has been

Page 2233

[1] promised that he or she will not be prosecuted should be
[2] examined by you with greater care than the testimony of an
[3] ordinary witness. You should scrutinize it closely to
[4] determine whether or not it is colored in such a way as to
[5] place guilt upon the defendant in order to further the
[6] witness' own interests; for, such a witness, confronted with
[7] the realization that he or she can win his or her own
[8] freedom by helping to convict another, has a motive to
[9] testify falsely.

[10] The prosecution has offered into evidence the
[11] actual letter of agreement in which the government has
[12] promised not to prosecute a witness under certain
[13] conditions. That agreement has been received so that you
[14] can have before you the actual terms under which the witness
[15] was promised immunity. I want to caution you that the
[16] agreement itself is no evidence that the witness has in fact
[17] testified truthfully. It may only be considered by you in
[18] deciding whether the witness has an interest in the outcome
[19] of this case which would motivate the witness to testify
[20] falsely, or whether it is in the witness' interest to
[21] testify truthfully, regardless of the outcome. In any
[22] event, you should accept this witness' testimony with great
[23] care. How much of it you choose to believe and the
[24] importance you wish to give to it are your decisions alone.
[25] After such scrutiny, you may give the testimony such weight,

Page 2234

[1] if any, as you believe it deserves.

[2] You have heard witnesses who have testified that
[3] they were actually involved in planning and carrying out the
[4] crimes charged in the indictment. There has been a great
[5] deal said about these so-called accomplice witnesses in the
[6] summations of counsel and about whether or not you should
[7] believe them.

[8] The government argues, as it is permitted to do,
[9] that it must take the witnesses as it finds them. It argues
[10] that only people who themselves take part in criminal
[11] activity have the knowledge required to show criminal
[12] behavior by others.

[13] For those very reasons, the law allows the use of
[14] accomplice testimony. Indeed, it is the law in federal
[15] courts that the testimony of accomplices may be enough in
[16] itself for conviction, if the jury finds that the testimony
[17] establishes guilt beyond a reasonable doubt.

[18] However, it is also the case that the accomplice
[19] testimony is of such nature that it should be scrutinized
[20] with great care and viewed with particular caution when you
[21] decide how much of that testimony to believe.

[22] I have given some general considerations on
[23] credibility and I will not repeat them here, nor will I
[24] repeat all the arguments made on both sides. However, let
[25] me say a few things that you may want to consider during

Page 2235

[1] your deliberations on the subject of accomplices.

[2] You should ask yourselves whether these so-called
[3] accomplices would benefit more by lying or by telling the
[4] truth. Was their testimony made up in any way because they
[5] believed or hoped that they would somehow receive favorable
[6] treatment by testifying falsely? Or did they believe that
[7] their interests would be best served by testifying
[8] truthfully? If you believe that the witness was motivated
[9] by hopes of personal gain, was the motivation one which
[10] would cause him or her to lie or was it one that would cause
[11] him or her to tell the truth? Did this motivation color the
[12] witness' testimony.

[13] In sum, you should look at all of the evidence in
[14] deciding what credence or what weight, if any, you will want
[15] to give to the accomplice witnesses.

[16] There are several persons whose names you have
[17] heard during the course of the trial but who did not appear
[18] here to testify, and one or more of the attorneys have
[19] referred to their absence from the trial. I instruct you
[20] that each party had an equal opportunity or lack of
[21] opportunity to call any of these witnesses. Therefore, you
[22] should not draw any inferences or reach any conclusions as
[23] to what they would have testified to had they been called.
[24] Their absence should not affect your judgment in any way.

[25] You should, however, remember my instruction that

## Page 2236

[1] the law does not impose on a defendant in a criminal case
[2] the burden or duty of calling any witnesses or producing any
[3] evidence.
[4]    I am almost finished with these general
[5] instructions. During the course of the trial, I have
[6] instructed you that certain evidence was admitted only for a
[7] limited purpose – namely, not as evidence that what was
[8] said was true, but only as evidence that it was in fact
[9] said, together with whatever reasonable inferences can be
[10] drawn from that fact about the state of mind of the speaker
[11] or the listener. You must be careful to follow these
[12] instructions. Evidence admitted solely to permit inferences
[13] about state of mind cannot be considered as proof of the
[14] truth of what was said.
[15]    The defendant, William Branston, is formally
[16] charged in an indictment. The indictment is merely an
[17] accusation. It is simply the means by which this criminal
[18] case was commenced. The indictment itself is neither
[19] evidence, nor proof of a defendant's guilt. It does not
[20] create any presumption nor permit any inference that the
[21] defendant is guilty. You should therefore give no weight
[22] whatsoever to the fact that an indictment has been returned
[23] against the defendant.
[24]    The defendant has entered a plea of not guilty
[25] and, in so doing, has denied the essential elements of the

## Page 2237

[1] charges in the indictment, and has placed the burden upon
[2] the government to prove every element of the charges beyond
[3] a reasonable doubt. That is the government's burden of
[4] proof, as I have just explained to you.
[5]    The indictment in this case contains 16 counts.
[6] Count 1 charges the defendant with conspiring
[7] with others, including Peter Alsop and Eugene Deveney, to
[8] violate laws of the United States, specifically, the
[9] Investment Advisors Act of 1940 and the federal wire fraud
[10] statute.
[11]    Each of Counts 2 through 7 charges the defendant
[12] with violating the Investment Advisors Act or the federal
[13] wire fraud statute based on his alleged participation in
[14] distributing false and misleading advertising materials on
[15] behalf of Tandem Management. From time to time in these
[16] instructions, I will refer to the scheme that is the subject
[17] of these counts as the alleged marketing fraud scheme.
[18]    Each of Counts 8 through 12 charges the defendant
[19] with violating the Investment Advisors Act or the federal
[20] wire fraud statute based on his alleged participation in
[21] misappropriating "soft-dollar" credits managed in trust on
[22] behalf of clients of Tandem Management, without disclosure
[23] of that fact to clients and in violation of the
[24] representations made by Tandem. From time to time in my
[25] instructions, I will refer to the scheme that is the subject

## Page 2

[1] of these counts as the alleged soft-dollar scheme.
[2]    So as to make our break coincide with your
[3] coffee, I will go on a few more pages until I am sure it has
[4] arrived for you.
[5]    Counts 13 through 15 charge the defendant with
[6] making false statements on registration applications filed
[7] on behalf of Tandem Management with the Securities and
[8] Exchange Commission.
[9]    Count 16 charges the defendant with committing
[10] perjury by testifying falsely under oath before the
[11] Securities and Exchange Commission.
[12]    You must, as a matter of law, evaluate each count
[13] separately and return a separate verdict of guilty or not
[14] guilty on each count of the indictment. I will explain to
[15] you the elements of each count shortly.
[16]    Lest you be concerned, you will have a verdict
[17] form with each count and a space for your recording a
[18] verdict as to each count. I will speak about that at the
[19] end of the charge.
[20]    As you know by now, the defendant has been
[21] indicted for a crime, and you each have a copy of the
[22] indictment which you may take into the jury room to assist
[23] you in your deliberations.
[24]    It is important for you to understand, as I said
[25] at the very outset of the trial and already this morning,

## Page 2

[1] that an indictment is merely an accusation; it is not
[2] evidence of the crime charged; it is not proof of a
[3] defendant's guilt. The indictment is merely a method or
[4] procedure under the law whereby persons accused of crimes
[5] the grand jury are brought into court to have their case
[6] tried by a trial jury such as yourselves. Therefore, the
[7] indictment must be given no evidentiary value but should be
[8] treated by you only as an accusation. No weight or
[9] significance whatsoever is to be given to the fact that an
[10] indictment has been brought against the defendant.
[11]    I will now turn to the specific charges in the
[12] case, beginning with Count 1 of the indictment. Count 1
[13] charges the defendant with participating in a conspiracy to
[14] violate the laws of the United States. That portion of the
[15] indictment reads as follows:
[16]    "1. At all times relevant to this indictment,
[17] Tandem Management Inc. ('Tandem') was an investment adviso
[18] registered with the United States Securities and Exchange
[19] Commission ('SEC') under Section 203 of the Investment
[20] Advisors Act of 1940, with offices located in New York, New
[21] York. Tandem was in the business of investing in securities
[22] on behalf of individual and institutional clients who
[23] retained the firm to manage their assets. Tandem
[24] exclusively invested the assets of its clients and did not
[25] engage in any trading of securities on its own behalf.

Page 2240

[1]  "2. At all times relevant to this indictment,
[2] William F. Branston, the defendant, held the positions of
[3] president and portfolio manager of Tandem, and was a
[4] co-owner of Tandem. Branston owned one/third of Tandem from
[5] the time of Tandem's formation in or about October 1991
[6] until in or about June 1993, and owned one/half of Tandem
[7] after June 1993.
[8]  "3. At all times relevant to this indictment,
[9] Eugene B. Deveney ('Deveney'), a co-conspirator not named as
[10] a defendant herein, held the position of managing director
[11] and portfolio manager of Tandem, and was a co-owner of
[12] Tandem. Deveney owned one/third of Tandem from the time of
[13] Tandem's formation in or about October 1991 until in or
[14] about June 1993, and owned one/half of Tandem after June
[15] 1993.
[16]  "4. From the time of Tandem's formation in or
[17] about October 1991 until in or about June 1993, Peter S.
[18] Alsop ('Alsop'), a co-conspirator not named as a defendant
[19] herein, held the position of executive vice president of
[20] Tandem and owned one/third of Tandem. In June 1993, Alsop
[21] relinquished his interest in Tandem and ceased to have
[22] further association with the firm.
[23]  "5. In order to become registered as an
[24] investment advisor and to keep that registration current,
[25] Tandem filed with the SEC an application, and at least three

Page 2241

[1] amended applications, for registration on the applicable
[2] uniform application for investment advisor registration,
[3] known as a 'Form ADV.' Each of these forms ADV was signed
[4] and certified on behalf of William F. Branston, the
[5] defendant, and remained on public file with the SEC.
[6]  "6. Under the law, Tandem and its employees,
[7] including William F. Branston, the defendant, owed fiduciary
[8] obligations of good faith and loyalty to the clients who
[9] entrusted their money to Tandem's management. As a result,
[10] in investing the clients' money, Tandem and its employees
[11] were under the duties, among others, to act in the best
[12] interest of the clients and not to misappropriate funds of
[13] its clients.
[14]  "7. From the time of its formation until in or
[15] about March 1993, Tandem offered its clients a choice of two
[16] types of investment accounts: long-term investment accounts
[17] and short-term 'aggressive trading' accounts. Beginning in
[18] or about March 1993, Tandem also offered a variation of its
[19] short-term accounts, known as 'technical pattern trading'
[20] accounts.
[21]  "8. Tandem arranged for each investment advisory
[22] client to open an account in that client's name in a
[23] securities brokerage firm and to grant Tandem discretionary
[24] authority to manage the assets in that account. Each client
[25] executed a standard form investment advisory agreement ('the

Page 2242

[1] investment advisory agreement') that, among other things,
[2] gave Tandem the power to act as the client's attorney for
[3] purposes of managing the account for the benefit of the
[4] client.
[5]  "9. For those services Tandem charged a
[6] disclosed and agreed-upon fee. Pursuant to the investment
[7] advisory agreement, each client agreed to pay Tandem (a) an
[8] 'administrative' fee consisting of a specified percentage of
[9] the total assets managed by Tandem for the client, (b) a
[10] 'performance' fee based on profits earned by Tandem on
[11] assets of the client under management, or (c) a combination
[12] of an 'administrative' and a 'performance' fee.
[13]  "10. As set forth below, beginning almost
[14] immediately after Tandem's formation in late 1991 and
[15] continuing through in or about 1995, William F. Branston,
[16] the defendant, and other Tandem employees, including Deveney
[17] and Alsop, devised and put into effect an unlawful scheme to
[18] obtain money for themselves and to defraud Tandem's
[19] investment advisory clients by (a) making misrepresentations
[20] with respect to Tandem's historical performance in managing
[21] clients' assets; and (b) misappropriating for themselves,
[22] under the guise of obtaining 'soft-dollar' services from
[23] securities brokers, hundreds of thousands of dollars of
[24] client fund, without authorization, and through unlawful and
[25] deceptive means.

Page 2243

[1]  "11. From in or about late 1991 through in or
[2] about late 1994, William F. Branston, the defendant, and
[3] other Tandem employees, in order to generate business for
[4] Tandem, prepared and distributed to clients and prospective
[5] clients marketing materials that misrepresented (i) the
[6] total amount of assets managed by Tandem and (ii) the
[7] historical rates of return earned on assets under management
[8] by Tandem, including the materials described below:
[9]  "a. Branston and other employees prepared and
[10] distributed on behalf of Tandem brochures that purported to
[11] show the rates of return for the year 1992 on the
[12] 'aggressive trading' accounts managed by Tandem. Each
[13] brochure reported that Tandem's clients obtained a rate of
[14] return in 1992 in excess of 30 percent. In fact, the
[15] 'aggressive trading' accounts managed by Tandem lost value
[16] in 1992 and thus had a negative rate of return;
[17]  "b. Branston and other employees prepared and
[18] distributed on behalf of Tandem a brochure that purported to
[19] show the annual and quarterly rates of return of a
[20] 'composite' of portfolios managed by Tandem under its
[21] long-term investment program. Although Tandem was not
[22] formed until late 1991, the brochure purported to show
[23] returns for 'Tandem' dating back to 1985 that substantially
[24] exceeded the performance of the S&P 500 in all but one year.
[25] The brochure stated that these returns were based on the

Page 2244

[1] results of portfolios managed by Branston while he was
[2] employed at other investment management firms. In fact,
[3] during some of the periods for which these returns were
[4] reported, Branston was employed as a securities broker, not
[5] a portfolio manager, and did not have authority to manage
[6] assets for clients. During most other periods, the actual
[7] rates of return on portfolios managed by Branston were
[8] substantially less than those reported in the brochure.
[9] Moreover, the brochure represented that these rates of
[10] return were achieved on portfolios of securities with an
[11] average value of $700 million, when no such portfolio
[12] existed;
[13] "c. Branston and other employees prepared and
[14] distributed a brochure for the purpose of promoting
[15] investment in a fund to be managed by Tandem under its
[16] 'technical pattern trading' program. The brochure stated
[17] that Tandem managed accounts under its 'technical pattern
[18] trading' program from 1989 to 1993 and earned annual rates
[19] of return on those accounts ranging from 26.9 percent to
[20] 47.7 percent. The brochure further stated that, as of
[21] January 1, 1994, Tandem managed $320 million of client
[22] assets, including $97 million in its 'technical pattern
[23] trading' accounts. In fact, all of these statistics were
[24] false. Tandem did not have a 'technical pattern trading'
[25] program until the spring of 1993, and did not manage assets

Page 2245

[1] in the amounts reported in the brochure; and.
[2] "d. Branston and other employees distributed
[3] with Tandem's marketing brochures the results of an annual
[4] survey by Nelson's, a publication serving the investment
[5] management industry, that ranked Tandem among America's 'Top
[6] 20 Money Managers' (i) for the year 1992 with respect to
[7] management of portfolios with a value of more than $100
[8] million comprised of 'growth' stocks; (ii) for the year 1992
[9] with respect to management of portfolios comprised of
[10] 'diversified growth' stocks of mid-sized corporations; and
[11] (iii) for the five-year period from approximately 1989 to
[12] approximately 1993 with respect to management of portfolios
[13] with a value of more than $100 million comprised of 'growth'
[14] stocks. According to Nelson's, Tandem earned an annual
[15] return of 21.4 percent on assets with a value of $128
[16] million in 1992 and, from approximately 1989 to 1993, Tandem
[17] earned a five-year annualized rate of return of 24.08
[18] percent on assets with a value of $220 million. In fact,
[19] these performance statistics were wholly fabricated by
[20] Branston who supplied them to Nelson's to induce Nelson's to
[21] publish them and to secure Tandem's ranking among the
[22] country's top money managers.
[23] "12. William F. Branston, the defendant, made
[24] false representations with respect to the amount of assets
[25] managed by Tandem on forms filed with the SEC and made part

Page 2

[1] of the SEC's publicly available records. On a Form ADV
[2] dated March 29, 1993, Branston falsely reported that Tandem
[3] managed client assets with an aggregate value of $134
[4] million. On a Form ADV dated March 11, 1994, Branston
[5] falsely reported that Tandem managed client assets with an
[6] aggregate value of $320 million.
[7] "13. 'Soft-dollar' services are services
[8] provided by securities brokers for their customers to use in
[9] connection with the purchase and sale of securities.
[10] 'Soft-dollar' services typically consist of providing
[11] customers with investment-related data or products, such as
[12] research reports pertaining to companies or computer
[13] software, that aid the customers either in selecting
[14] securities or in valuing securities. Brokers who provide
[15] 'soft-dollar' services typically set aside a percentage of
[16] the commissions charged for securities transactions as a
[17] credit or rebate that may be used by the customers to
[18] purchase 'soft-dollar' services.
[19] "14. Section 28(e) of the Securities Exchange
[20] Act of 1934 authorizes an investment manager to use
[21] 'soft-dollar' credits made available to its clients to pay
[22] for services that would otherwise be paid by the investment
[23] manager if (a) those services are limited to those
[24] classified as 'research' or 'brokerage' services, and (b)
[25] the investment manager determines in good faith that the

Page 2

[1] amount paid by the client or clients for such services is
[2] reasonable in relation to the value of the services, viewed
[3] either in terms of the particular transaction in which the
[4] commissions were paid or the investment manager's overall
[5] responsibilities with respect to the accounts as to which he
[6] exercises investment discretion.
[7] "15. Pursuant to the investment advisory
[8] agreement executed by Tandem and its clients, Tandem had the
[9] authority,
[10] 'in effecting . investments, reinvestments,
[11] purchases and sales [for each client's account], to use and
[12] obtain the assistance and services of such brokers, dealers,
[13] investment bankers, underwriters, and other firms,
[14] enterprises and services as [Tandem] in the complete and
[15] unlimited exercise of [Tandem's] discretion shall designate
[16] and select, including the ability to arrange for third-party
[17] brokers to pay for any expenses which would otherwise be
[18] borne by [Tandem].'
[19] "16. On Forms ADV filed with the SEC and
[20] provided to each of Tandem's clients, William F. Branston,
[21] the defendant, described the 'products, research and
[22] services' Tandem received from brokers and the factors
[23] Tandem considered 'in selecting brokers for its clients and
[24] in determining the reasonableness of their commissions' as
[25] follows:

Page 2248

[1] 'The initial criteria that Tandem Management
[2] Incorporated applies in selecting a broker to effect a
[3] securities transaction for any of its clients is whether the
[4] broker can provide the best price and execution for the
[5] transaction. In accordance with Section 28(e) of the
[6] Securities Exchange Act of 1934, however, Tandem Management
[7] Inc. may select as brokers for its clients, those firms that
[8] furnish such research services as fundamental analyses of
[9] the economy, the political environment, the financial
[10] markets, specific industries, and/or individual securities.
[11] In following this policy, commissions may be paid that are
[12] higher than those obtainable from other brokers who do not
[13] provide research services. The research services provided
[14] by the broker used in a particular transaction is [sic] used
[15] to service all accounts. No formal procedures are used to
[16] direct client transactions to a particular broker in return
[17] for products and research services received. Brokers are
[18] regularly evaluated by Tandem Management Inc. to determine
[19] the value to clients' accounts derived from the services
[20] provided and the reasonableness of the commissions paid.'
[21] 17. From in or about late 1991 through in or
[22] about early 1995, William F. Branston, the defendant, and
[23] other Tandem employees, entered into what purported to be
[24] 'soft-dollar' arrangements with, among others, Hoenig & Co.
[25] Inc. ('Hoenig'), Capital Institutional Services ('Capital'),

Page 2249

[1] Reynders Gray & Co., Inc. ('Reynders'), and Tiedemann
[2] International Research Inc. ('Tiedemann'), hereafter
[3] referred to collectively as 'the Brokers.' These
[4] arrangements included the following terms:
[5] "a. Tandem agreed to cause its clients to pay a
[6] Broker a specified commission (e.g., 7 cents a share) for
[7] executing purchases and sales of securities for Tandem's
[8] clients;
[9] "b. The Broker agreed to set aside a large
[10] percentage of that commission as 'soft-dollar' credit.
[11] Those credits were available to Tandem to use to obtain
[12] 'soft-dollar' services on behalf of its clients; and
[13] "c. Rather than providing the 'soft-dollar'
[14] services to Tandem or its clients directly, the Broker
[15] agreed to permit Tandem to use the 'soft-dollar' credits by
[16] purchasing goods or services from vendors of its choice and
[17] then submitting the invoices for these goods and services to
[18] the broker for payment or reimbursement.
[19] "18. As described below, however, William F.
[20] Branston, the defendant, and other Tandem employees
[21] manipulated the 'soft-dollar' arrangements with Brokers to
[22] (a) convert the 'soft-dollar' credits available to Tandem
[23] for use on behalf of its clients into cash, and (b) divert
[24] the cash to their personal benefit. They did so by causing
[25] Brokers to 'reimburse' Tandem or themselves, in cash, for

Page 2250

[1] hundreds of thousands of dollars of purported 'soft-dollar'
[2] expenses that in fact had already been reimbursed or had
[3] never been incurred at all.
[4] "19. Among the means by which William F.
[5] Branston, the defendant, effected this unlawful
[6] misappropriation were the following:
[7] "a. Branston caused Tandem to submit the same
[8] invoice to more than one Broker, thereby obtaining multiple
[9] reimbursement for 'soft-dollar' expenses that Tandem paid
[10] only once;
[11] "b. Branston caused Tandem to submit to Brokers
[12] altered versions of invoices that Tandem had previously
[13] submitted to that Broker, thereby obtaining multiple
[14] reimbursement for 'soft-dollar' expenses that Tandem had
[15] paid only once;
[16] "c. Branston caused Tandem to submit to Brokers
[17] for reimbursement 'informational' invoices and other
[18] invoices that did not require payment or for which payment
[19] was excused, thereby obtaining reimbursement for expenses
[20] that Tandem did not pay at all; and
[21] 'd. Branston caused Tandem to submit to Brokers
[22] for reimbursement invoices for wholly fictitious expenses,
[23] including tens of thousands of dollars of invoices for a
[24] subscription to the data service of a vendor named 'First
[25] Call' which Tandem neither paid for nor received.

Page 2251

[1] "20. From in or about November 1993 through in
[2] or about 1995, William F. Branston, the defendant, and other
[3] Tandem employees, entered into an arrangement with Sherwood
[4] Securities ('Sherwood'), a brokerage firm, whereby Sherwood
[5] agreed to rebate in cash over half of the commissions paid
[6] by Tandem's clients for brokerage services. Under this
[7] arrangement, Tandem, as fiduciary for its clients, collected
[8] the rebated portion of the commissions. Rather than
[9] returning the rebates to Tandem's clients, however, Branston
[10] and other Tandem employees kept the rebates for themselves
[11] and Tandem.
[12] 21. As described above, the misappropriation of
[13] 'soft-dollar' credits and rebates with respect to the
[14] brokerage commissions paid by Tandem's clients was
[15] accomplished (a) in violation of the fiduciary obligations
[16] of Tandem and its employees, (b) in violation of the
[17] investment advisory agreement, and (c), by means of a Form
[18] ADV that misrepresented Tandem's soft-dollar practices, and
[19] unlawfully failed to disclose, among other material facts:
[20] (i) that most of the 'soft-dollar' credits that Tandem's
[21] clients paid for were converted to the personal benefit of
[22] Tandem's employees and were not used to pay expenses related
[23] to Tandem's investment advisory business; (ii) that Tandem
[24] used 'soft-dollar' credits paid for by its clients for
[25] purposes other than obtaining 'such research services as

Page 2252

[1] fundamental analyses of the economy, the political
[2] environment, the financial markets, specific industries,
[3] and/or individual securities,' including payment of its
[4] office rent, legal fees and other operating expenses; and
[5] (iii) that Tandem caused its clients to pay higher brokerage
[6] commissions to Sherwood in order to generate cash rebates
[7] for the benefit of Tandem and its employees.
[8]     "22. From in or about late 1991 until in or
[9] about 1995, in the Southern District of New York and
[10] elsewhere, William F. Branston, the defendant, and others
[11] known and unknown, including Deveney and Alsop, unlawfully,
[12] willfully and knowingly, did combine, conspire, confederate,
[13] and agree together and with each other to commit offenses
[14] against the United States, namely, to violate Title 15,
[15] United States Code, Sections 80b-6 and 80b-17, and Title 18,
[16] United States Code, Section 1343.
[17]     "23. It was a part and object of the conspiracy
[18] that William F. Branston, the defendant, and others known
[19] and unknown, including Deveney and Alsop, unlawfully,
[20] willfully, and knowingly would and did cause Tandem, by use
[21] of the mails or other means and instrumentalities of
[22] interstate commerce, directly and indirectly, to (a) employ
[23] devices, schemes, and artifices to defraud clients and
[24] prospective clients; (b) engage in transactions, practices,
[25] and courses of business which operated as a fraud and deceit

Page 2

[1] omissions concerning the amount of assets under management
[2] by Tandem and the historical rates of return earned on those
[3] assets;
[4]     "b. Branston and his co-conspirators would and
[5] did file with the SEC Forms ADV that contained material
[6] misrepresentations and omissions concerning the amount of
[7] client assets under management by Tandem and Tandem's
[8] 'soft-dollar' practices; and
[9]     "c. Branston and his co-conspirators would and
[10] did, in violation of their fiduciary obligations to Tandem's
[11] clients and of the investment advisory agreement,
[12] misappropriate to themselves 'soft-dollar' credits and
[13] brokerage commission rebates that Tandem managed in trust or
[14] behalf of its clients."
[15]     At this point, ladies and gentlemen, having read
[16] that initial portion of the indictment, why don't we take a
[17] break, and then we will resume.
[18]     Thank you for your attention.
[19]     (Recess)
[20]     (Continued on next page)
[21]
[22]
[23]
[24]
[25]

Page 2253

[1] upon clients and prospective clients; and (c) engage in
[2] acts, practices, and courses of business which were
[3] fraudulent, deceptive, and manipulative, in violation of
[4] Title 15, United States Code, Sections 80b-6 and 80b-17, and
[5] Title 17, Code of Federal Regulations, Section
[6] 275.206(4)-1(a)(5).
[7]     "24. It was a further part and object of the
[8] conspiracy that William F. Branston, the defendant, and
[9] others known and unknown, including Deveney and Alsop,
[10] unlawfully, willfully, and knowingly would and did devise
[11] and intend to devise a scheme and artifice to defraud and
[12] for obtaining money and property by means of false and
[13] fraudulent pretenses, representation, and promises, and for
[14] the purpose of executing said scheme and artifice, would and
[15] did transmit and cause to be transmitted by means of wire
[16] communication in interstate commerce writings, signs,
[17] signals, and sounds, in violation of Title 8, United States
[18] Code, Section 1343.
[19]     "25. Among the means and methods by which
[20] William F. Branston, the defendant, and others known and
[21] unknown, including Deveney and Alsop, would and did carry
[22] out the conspiracy were as follows:
[23]     "a. Branston and his co-conspirators would and
[24] did distribute to clients and prospective clients marketing
[25] materials that contained material misrepresentations and

Page 22

[1]     (In open court; jury present)
[2]     THE COURT: Welcome back. Thank you for being so
[3] prompt. Did you decide if you wished a second break?
[4]     THE JURY: Yes.
[5]     THE COURT: What is the verdict, so to speak?
[6]     THE JURY: Yes.
[7]     THE COURT: Thank you.
[8]     THE JURY: The coffee drinkers want it.
[9]     THE COURT: I'm there. Won't you be seated,
[10] ladies and gentlemen.
[11]     Before our break, I had just turned to the first
[12] count in the indictment, and as I mentioned to you, that
[13] count charges the defendant with participating in a
[14] conspiracy to violate certain laws of the United States. I
[15] read to you that portion of that first count in the
[16] indictment. Now I'd like to resume on that first count and
[17] let you know that the relevant statute on this point is 18
[18] U.S.C. Section 371. It provides in pertinent part as
[19] follows:
[20]     "If two or more persons conspire to commit any
[21] offense against the United States and one or more of such
[22] persons do any act to effect the object of the conspiracy,
[23] each is guilty of an offense against the United States."
[24]     In this case, the defendant is accused of having
[25] been a member of a conspiracy to violate certain federal

Page 2260

[1] must have had a stake in the venture or in its outcome. You
[2] are instructed that while proof of a financial interest in
[3] the outcome of a scheme is not essential, if you find that
[4] the defendant had such an interest, that is a factor which
[5] you may properly consider in determining whether or not the
[6] defendant was a member of the conspiracy charged in the
[7] indictment.
[8]     As I mentioned a moment ago, before the defendant
[9] can be found to be a conspirator, you must find that he
[10] knowingly joined in the unlawful agreement or plan. The key
[11] question, therefore, is whether the defendant joined the
[12] conspiracy with an awareness of at least some of the basic
[13] aims and purposes of the unlawful agreement. It is
[14] important for you to know the defendant's participation in
[15] the conspiracy must be established by independent evidence
[16] of his own acts or statements as well as those of the other
[17] alleged co-conspirators and the reasonable inferences that
[18] can be drawn from them.
[19]     The defendant's knowledge is a matter of
[20] inference from the facts proved. In this connection, I
[21] instruct you that to become a member of the conspiracy, the
[22] defendant need not have known the identities of each and
[23] every member, each and every other member, nor need he be
[24] apprised of all of their activities. Moreover, the
[25] defendant need not have been fully informed as to all of the

Page 2261

[1] details or the scope of the conspiracy in order to justify
[2] an inference of knowledge on his part.
[3]     Furthermore, the defendant need not have joined
[4] in all of the conspiracy's unlawful objectives. The extent
[5] of a defendant's participation has no bearing on the issue
[6] of a defendant's guilt. A conspirator's liability is not
[7] measured by the extent or duration of his participation.
[8] Indeed, each member may perform separate and distinct acts
[9] and may perform them at different times.
[10]     Some conspirators may play major roles while
[11] others play minor roles in the offense. An equal role is
[12] not what the law requires. In fact, even a single act may
[13] be sufficient to draw the defendant within the ambit of a
[14] conspiracy.
[15]     I want to caution you, however, that the
[16] defendant's mere presence at the scene of the alleged crime
[17] does not by itself make him a member of conspiracy.
[18] Similarly, mere association with one or more members of the
[19] conspiracy does not automatically make the defendant a
[20] member. A person may know or be friendly with a criminal
[21] without being a criminal himself. Mere similarity of
[22] conduct or the fact that they may have assembled together
[23] and discussed common aims and interests does not necessarily
[24] establish proof of the existence of a conspiracy.
[25]     I also want to caution you that mere knowledge or

Page :

[1] acquiescence without participation in the unlawful plan is
[2] not sufficient. Moreover, the fact that the acts of a
[3] defendant without knowledge merely happened to further the
[4] purposes or objectives of the conspiracy does not make the
[5] defendant a member. More is required under the law.
[6]     What is necessary is that the defendant must have
[7] participated with knowledge of at least some of the purposes
[8] or objectives of the conspiracy and with the intention of
[9] aiding in the accomplishment of those unlawful ends.
[10]     In sum, the defendant, with an understanding of
[11] the unlawful character of the conspiracy, must have
[12] intentionally engaged, advised or assisted in it for the
[13] purposes of furthering the illegal undertaking. He thereby
[14] becomes a knowing and willing participant in the unlawful
[15] agreement; that is to say, a conspirator.
[16]     The third element that the government must prove
[17] beyond a reasonable doubt to establish the offense of
[18] conspiracy is that at least one overt act was knowingly
[19] committed in furtherance of the conspiracy by at least one
[20] of the conspirators in the Southern District of New York at
[21] or about the time and place alleged. I instruct you as a
[22] matter of law that Manhattan falls within the geographic
[23] boundaries of the Southern District of New York.
[24]     The indictment charges that the following overt
[25] acts were committed in the Southern District of New York.

Page 2

[1]     26. In furtherance of the conspiracy and to
[2] effect its illegal objects, William F. Branston, the
[3] defendant, and others known and unknown, committed the
[4] following overt acts, among others, in the Southern District
[5] of New York and elsewhere:
[6]     A: On or about August 13, 1992, in New York, New
[7] York, Deveney transmitted by facsimile to MLR&L Partners a
[8] chart entitled "Aggressive management performance" that
[9] falsely represented that the short-term-aggressive-trading
[10] accounts managed by Tandem earned a 19 percent return in th
[11] first 7 months of 1992;
[12]     B. On or about February 24, 1993, in New York,
[13] New York, William F. Branston, the defendant, transmitted by
[14] facsimile to Nelson Publications for inclusion in Nelson
[15] Investment Managers Database a completed questionnaire in
[16] which he falsely reported that Tandem had total assets under
[17] management of $130 million as of December 31, 1992 and of
[18] $52 million as of December 31, 1991;
[19]     C. On or about March 29, 1993, in New York, New
[20] York, William F. Branston, the defendant, executed on behalf
[21] of Tandem a Form ADV that falsely reported that Tandem
[22] managed client assets with an aggregate market value of $134
[23] million;
[24]     D. On or about June 16, 1993, in New York, New
[25] York, a member of the conspiracy transmitted by facsimile to

Page 2256

[1] laws – here, the Investment Advisors Act, which prohibits
[2] fraudulent conduct by investment advisors; and the federal
[3] wire fraud statute, which prohibits the use of interstate
[4] wire communication, including telephone calls and faxing, in
[5] furtherance of fraudulent schemes and artifices.
[6]    A conspiracy is a kind of criminal partnership, a
[7] combination or agreement of two or more persons to join
[8] together to accomplish some unlawful purpose. The crime of
[9] conspiracy to violate a federal law is an independent
[10] offense. It's separate and distinct from the actual
[11] violation of any specific federal laws, which the law refers
[12] to as "substantive crimes."
[13]    Indeed, you may find a defendant guilty of the
[14] crime of conspiracy to commit an offense against the United
[15] States even though the substantive crimes which were the
[16] object of the conspiracy were not actually committed.
[17] Congress has deemed it appropriate to make conspiracy
[18] standing alone a separate crime even if the conspiracy is
[19] not successful. This is ecause collective criminal
[20] activity poses a greater threat to the public safety and
[21] welfare than individual conduct and increases the likelihood
[22] of success of a particular criminal venture.
[23]    In order to satisfy s burden of proof, the
[24] government must es blish each of the following four
[25] essential elements b yond a reasonable doubt:

Page 2257

[1]    1. That two or more persons entered the unlawful
[2] agreement charged in the indictment starting on or about
[3] late 1991 until on or bout early 1995;
[4]    2. That the defendant knowingly and willfully
[5] became a member of the conspiracy;
[6]    3. That one of the members of the conspiracy
[7] knowingly committe at least one of the overt acts charged
[8] in the indictment; and
[9]    4. That the overt acts which you find to have
[10] been committed were committed to further some bjective of
[11] the conspiracy.
[12]    The first element at the go ernment must prove
[13] beyond a reasonable doubt to establish the offense of
[14] conspiracy is that two or more persons entered the unlawful
[15] agreement charged the indictment. In this instance,
[16] there were two unlawfu l purposes alleged to b the objects
[17] of the conspiracy: One, to violate the Investment Advisors
[18] Act; and two, to viola e the federal wire fraud statute.
[19]    The indictment alleges two distinct means by
[20] which each of these objects was to be accomplished: One, by
[21] distributing to clients and prospective clients
[22] advertisements and her marketing materials at contained
[23] misrepresentations ntaining the amount of a sets under
[24] management by Tan em and its principals and the historical
[25] rates of return earne on those assets; and, two by

Page 2258

[1] misappropriating soft-dollar credits managed in trust on
[2] behalf of clients of Tandem Management, without disclosure
[3] of that fact to clients and in violation of representations
[4] made by Tandem.
[5]    In order for the government to satisfy this
[6] element, you need not find that the alleged members of the
[7] conspiracy met together and entered into any formal or
[8] express agreement. Similarly, you need not find that the
[9] alleged conspirators stated in words or writing what the
[10] scheme was. its object or purposes or ever precise detail
[11] of the scheme or ne means by which its ot ject or purp se
[12] was to be accomplished.
[13]    What the government must prove is that there was
[14] a mutual understanding, either spoken or unspoken, between
[15] two or more people to cooperate with each other to
[16] accomplish an ur lawful act. You may, of cou se, find that
[17] the existence of agreement to disobey o disregard the
[18] law has been es lished by direct proof. However, since
[19] conspiracy is Ly s very nature characterized by secrecy,
[20] you may also infer its existence from the circumstances of
[21] the case and the onduct of the parties invo ved.
[22]    In a very real sense, then, in the context of
[23] conspiracy cases, ctions often speak louder than words. In
[24] this regard, you n ay, in determining wheth r an agreement
[25] existed here, onsider the actions and state nents of all

Page 2259

[1] those you find to be participants as proof th t a common
[2] design existed on the part of the persons c arged to act
[3] together to acco plish an unlawful purpo e.
[4]    The second el ment that the governmer t nust prove
[5] beyond a reas na le doubt to establish the offense of
[6] conspiracy is that the defendant knowingly, willfully and
[7] voluntarily becan e a member of the consp acy.
[8]    "Knowingly" n cans to act voluntarily an
[9] deliberately rathe than mistakenly or inadvertently.
[10]    "Willfully' means to act knowingly and p osely,
[11] with an intent to o something that the law orbids; that is
[12] to say, with a bad urpose, either to disobey or disregard
[13] the law.
[14]    If you are satis ed that the conspiracy ci arged
[15] in the indictment xisted, you mu st next ask yourselves who
[16] the members cf t conspiracy vere. Deciding whether the
[17] defendant becan e a member of the conspiracy, you
[18] should consider ether the defendant knowingly and
[19] willfully joined in ne conspiracy.
[20]    Did he pa ticipate in it with k owledge its
[21] unlawful purpose and with the s cific inte tion of
[22] furthering it bus ess or object ve as a lea r, associate
[23] or worker.
[24]    In that regard, s b en aid that in orde for
[25] a defendant to be eeme parti ip ant ir a onspiracy, ne

Page 2264

[1] a securities broker in Chestnut Hill, Massachusetts, a chart
[2] entitled "Aggressive management performance" that falsely
[3] represented that the short-term-aggressive-trading accounts
[4] managed by Tandem earned a 30.7 percent return in 1992;
[5] E. On or about August 17, 1992, in New York, New
[6] York, William F. Branston, the defendant, transmitted by
[7] facsimile to Reynders an instruction to reimburse Tandem
[8] using soft-dollar credits of Tandem's clients for two
[9] invoices issued by the Hanseatic Group, Inc. in the amount
[10] of $12,000;
[11] F. On or about February 26, 1993, in New York,
[12] New York, William F. Branston, the defendant, transmitted by
[13] facsimile to Capital in Dallas, Texas an instruction to
[14] reimburse Tandem using soft-dollar credits of Tandem's
[15] clients for an invoice issued by Standard & Poor's Compustat
[16] Services in the amount of $13,801.87;
[17] G. On or about March 23, 1993, in New York, New
[18] York, William F. Branston, the defendant, transmitted by
[19] facsimile to Hoenig an instruction to reimburse Branston
[20] personally using soft-dollar credits of Tandem's clients for
[21] an invoice issued by Global Information Technologies, Inc.
[22] in the amount of $12,000.
[23] Now, the purpose of this overt act requirement is
[24] clear. There must have been something beyond mere
[25] agreement. Some overt step or action must have been taken

Page 2265

[1] by at least one of the conspirators in furtherance of the
[2] conspiracy.
[3] In order for the government to satisfy this
[4] element, it's not required that all of the overt acts
[5] alleged in the indictment be proven. In addition, you may
[6] find that overt acts were committed which are not alleged in
[7] the indictment. The only requirement is that one of the
[8] conspirators, not necessarily the defendant, knowingly
[9] committed an overt act in furtherance of the conspiracy in
[10] the Southern District of New York during the life of the
[11] conspiracy. Further, the overt act need not have been
[12] committed at precisely the time alleged in the indictment.
[13] It is sufficient if you are convinced beyond a reasonable
[14] doubt that it occurred at or about the time and place
[15] stated.
[16] The fourth, and final, element which the
[17] government must prove beyond a reasonable doubt is that the
[18] overt act was committed for the purpose of carrying out the
[19] unlawful agreement.
[20] In order for the government to satisfy this
[21] element, it must prove beyond a reasonable doubt that at
[22] least one overt act was knowingly and willfully done by at
[23] least one conspirator in furtherance of some object or
[24] purpose of the conspiracy as charged in the indictment. In
[25] this regard, you should bear in mind that the overt act

Page 2266

[1] standing alone may be an innocent and lawful act.
[2] Frequently, however, an apparently innocent act sheds its
[3] harmless character if it is a step in carrying out,
[4] promoting, aiding or assisting the conspiratorial scheme.
[5] You are, therefore, instructed that the overt act does not
[6] have to be an act which in and of itself is criminal or
[7] constitutes an objective of the conspiracy.
[8] We have now finished Count 1, the conspiracy
[9] count of the indictment.
[10] I come now, ladies and gentlemen, to the
[11] so-called substantive counts of the indictment, but before I
[12] come to that, I would like to say something to you in
[13] further clarification of the difference between the
[14] conspiracy count and the substantive counts. The violations
[15] charged in Counts 2 through 12 are also alleged to be
[16] objectives of the conspiracy charged in Count 1 which you
[17] just considered.
[18] Conspiracy, as you'll recall, is a crime separate
[19] from the violations that form its objectives. Think about
[20] that just for a minute. Conspiracy is a separate crime from
[21] the violations that form its objectives. Because the
[22] government contends that the substantive violations actually
[23] occurred, the defendant is charged in the indictment with
[24] the substantive offenses as well as with the conspiracy.
[25] Counts 2 through 7 charge the defendant with

Page 2267

[1] violations of the Investment Advisors Act and federal wire
[2] fraud statute based on his alleged participation in the
[3] marketing fraud scheme.
[4] Counts 8 through 12 charge the defendant with
[5] violation of those same statutes based upon his alleged
[6] participation in the soft-dollar scheme.
[7] I'll now explain the elements of these alleged
[8] substantive offenses beginning with Counts 2 through 5.
[9] Counts 2 through 5 charge Mr. Branston with violating
[10] Section 206 of the Investment Advisors Act, which is the
[11] general antifraud provision of that act. Section 206
[12] provides in pertinent part as follows:
[13] "It shall be unlawful for any investment advisor,
[14] by use of the mails or any means or instrumentality of
[15] interstate commerce, directly or indirectly:
[16] One, to employ any device, scheme or artifice to
[17] defraud any client or prospective client;
[18] Two, to engage in any transaction, practice or
[19] course of business which operates as a fraud or deceit upon
[20] any client or prospective client;
[21] Four, to engage in any act, practice or course of
[22] business which is fraudulent, deceptive or manipulative.
[23] Counts 2 through 5 read as follows. Paragraph
[24] 27. This, of course, is from the indictment. The
[25] allegations of Paragraphs 1 through 9, 11 through 12 and 26

Page 2268

[1] A through D are repeated and realleged as though fully set
[2] forth herein. I have read you those before. I will not
[3] read them again.
[4]     28. On or about the date set forth below, in the
[5] Southern District of New York and elsewhere, William F.
[6] Branston, the defendant, unlawfully, willfully and
[7] knowingly, did cause Tandem, by the use of the mails and
[8] other means and instrumentalities of interstate commerce,
[9] directly or indirectly to:
[10]     A: Employ devices, schemes and artifices to
[11] defraud the following clients;
[12] B. Engage in transactions, practices and courses
[13] of business which operated as a fraud and deceit upon the
[14] following clients; and
[15] C. Engage in acts, practices and courses of
[16] business which were fraudulent, deceptive and manipulative
[17] in connection with the solicitation of the following
[18] clients, including, by directly and indirectly, publishing,
[19] circulating and distributing, in contravention of Title 17,
[20] Code of Federal Regulations, Section 275.2064-185,
[21] advertisements which contained untrue statements of material
[22] fact and which were otherwise false and misleading;
[23] Count 2. The client is Oxbridge Associates, LP.
[24] The approximate time period in which that client retained
[25] Tandem was October 1993 through June 1994.

Page 2269

[1]     Count 3. Client: Peter Greenfield. Approximate
[2] time period the client retained Tandem was October 1993 to
[3] October 1994.
[4]     Count 4. MLR&R Partners. The approximate time
[5] period is August 1992 through January 1994.
[6]     Count 5. The client is the Pooled Employee Trust
[7] Fund of the Bank of Boston Growth Equity Fund. The time
[8] period is approximately June, 1993 through August 1994.
[9]     To find the defendant guilty of violating the
[10] Investment Advisors Act as charged in Counts 2 through 5,
[11] the government must establish the following four elements:
[12]     1. That Tandem was an investment advisor;
[13] 2. That the defendant, acting on behalf of
[14] Tandem, either: (1) Employed a device, scheme or artifice
[15] to defraud the client named in the count you are
[16] considering; or (2) engaged in a transaction, practice or
[17] course of business which operated as a fraud and deceit upon
[18] that client;
[19] 3. That the defendant devised or participated in
[20] such device, scheme or artifice to defraud or such
[21] fraudulent transaction practice or course of business
[22] knowingly and willfully and with the intent to defraud; and.
[23]     4. That the defendant employed such device,
[24] scheme or artifice to defraud, or engaged in such
[25] transaction, practice or course of business by use of the

Page 22

[1] mails or any other instrumentality of interstate commerce.
[2]     Let's discuss each of those four elements. In
[3] order to satisfy the first element, the government must
[4] prove beyond a reasonable doubt that Tandem was an
[5] investment advisor. For the purposes of the statute, an
[6] investment advisor includes any person or company which for
[7] compensation engages in the business of advising others,
[8] either directly or through publications or writings, as to
[9] the value of securities or as to the advisability of
[10] investing in purchase or selling securities.
[11]     The second element of the Investment Advisors Act
[12] charges requires the government to establish beyond a
[13] reasonable doubt that the defendant participated in a scheme
[14] or artifice to defraud the client named in the count of the
[15] indictment that you're considering.
[16]     The language describing this first element is
[17] almost self-explanatory. A scheme or artifice is simply a
[18] plan for the accomplishment of an object. A scheme or
[19] artifice to defraud is any plan, device or course of action
[20] to obtain money or property by means of false or fraudulent
[21] pretenses, misrepresentations or promises reasonably
[22] calculated to deceive persons of average prudence.
[23]     "Fraud" is a general term which embraces all
[24] various means by which human ingenuity can devise and which
[25] are resorted to by an individual to gain an advantage over

Page 22

[1] another by false misrepresentations, suggestions or
[2] suppression of the truth or deliberate disregard of the
[3] truth.
[4]     Thus, a scheme or artifice to defraud is merely a
[5] plan to deprive another of money or property by trick,
[6] deceit, deception or swindle.
[7]     A statement, representation, claim or document is
[8] false if it is untrue when made and was then known to be
[9] untrue by the person making it or causing it to be made. A
[10] representation or statement is fraudulent if it was falsely
[11] made, with the intention to deceive.
[12]     Deceitful statements or half-truths or the
[13] concealment of material facts and the expression of an
[14] opinion not honestly entertained may also constitute false
[15] or fraudulent statements under the statute. The deception
[16] need not be premised on spoken or written words alone. The
[17] arrangement of the words or the circumstances in which they
[18] are used may convey the false and deceptive appearance.
[19]     If there is deception, the manner in which it is
[20] accomplished is immaterial. The false or fraudulent
[21] misrepresentation must relate to a material fact or matter.
[22] A material fact is one which would reasonably be expected to
[23] be of concern to a reasonable and prudent person who is
[24] relying upon the representation or statement in making a
[25] decision. This means that if you find a particular

Page 2272

[1] statement of fact to be false, you must determine whether
[2] that statement was one that a reasonable person or investor
[3] might have considered important in making his or her
[4] decision. The same principle applies to fraudulent
[5] half-truths or omissions of material fact.
[6]     In order to establish a scheme to defraud, the
[7] government is not required to establish that the defendant
[8] himself originated the scheme to defraud. It is sufficient
[9] if you find that a scheme to defraud existed even if
[10] originated by another and that the defendant knowingly
[11] participated in it.
[12]     Furthermore, it is not necessary for the
[13] government to establish that the defendant realized any gain
[14] from the scheme or that the intended victim actually
[15] suffered any loss. However, the government must prove that
[16] the alleged scheme contemplated depriving another of money
[17] or property.
[18]     In this case, it so happens that the government
[19] contends that the scheme succeeded and the victims were
[20] defrauded. The question for you to decide is did the
[21] defendant knowingly devise or participate in a scheme to
[22] defraud and to obtain money. Whether or not the scheme
[23] actually succeeded is not a question you may consider in
[24] determining whether the scheme existed. It is enough if you
[25] find that a false statement or a statement omitting material

Page 2273

[1] facts was made as a part of a fraudulent scheme in the
[2] expectation that it would be relied on by the person or
[3] entity named in the count of the indictment that you're
[4] considering. You must concentrate on whether there was such
[5] a scheme, not on the consequences of the scheme.
[6]     Finally, a scheme to defraud need not be shown by
[7] direct evidence, but may be established by all of the
[8] circumstances and facts in the case.
[9]     If you find that the government has sustained its
[10] burden of proof that a scheme to defraud did exist as
[11] charged, you next should consider the third element. The
[12] third element of the Investment Advisers Act charges
[13] requires the government to establish beyond a reasonable
[14] doubt that the defendant participated in the scheme to
[15] defraud knowingly, willfully and with the specific intent to
[16] defraud.
[17]     I have already explained to you the terms
[18] "knowing" and "willful" in the context of instructing you on
[19] the second element of the conspiracy charge. These terms
[20] carry the same meaning in all the charges of the indictment.
[21]     "Intent to defraud" means to act knowingly and
[22] with the specific intent to deceive, for the purpose of
[23] depriving another of money or property. The question of
[24] whether a person acted knowingly, willfully with intent to
[25] defraud is a question of fact for you to determine like any

Page 2274

[1] other fact question. This question obviously involves
[2] someone's state of mind. Direct proof of knowledge and
[3] fraudulent intent is almost never available. It would be a
[4] rare case that it would be shown that a person wrote or
[5] stated that as of a given time in the past, he committed an
[6] act with a fraudulent intent. Such direct proof is not
[7] required, however.
[8]     The ultimate facts of knowledge and criminal
[9] intent, though subjective, may be established by
[10] circumstantial evidence based upon a person's outward
[11] manifestations, his words, his conduct, his acts and all the
[12] surrounding circumstances disclosed by the evidence and the
[13] rational or logical inferences that can be drawn from them.
[14] Circumstantial evidence, if believed, is of no less value
[15] than direct evidence. In either case, the essential
[16] elements of the crime must be established beyond a
[17] reasonable doubt.
[18]     Since an essential element of the crime charged
[19] is intent to defraud, it follows that good faith on the part
[20] of the defendant is a complete defense to these charges. A
[21] defendant, however, has no burden to establish the defense
[22] of good faith. The burden is on the government to prove
[23] fraudulent intent and the consequent lack of good faith
[24] beyond a reasonable doubt. Even false misrepresentations or
[25] statements or omissions of material fact do not amount to a

Page 2275

[1] fraud unless done with fraudulent intent. However
[2] misleading or deceptive the plan may be, it is not
[3] fraudulent if it was devised or carried out in good faith.
[4] An honest belief in the truth of the representations made by
[5] a defendant is a good defense, however inaccurate the
[6] statements may turn out to be.
[7]     As a practical matter, then, in order to sustain
[8] the charges against the defendant, the government must
[9] establish beyond a reasonable doubt that he knew his conduct
[10] as a participant in the scheme was calculated to deceive
[11] and, nonetheless, he associated himself with the alleged
[12] fraudulent scheme for the purpose of depriving another of
[13] money or property.
[14]     The government can also meet its burden of
[15] showing that the defendant had knowledge of the falsity of
[16] the statements if it established beyond a reasonable doubt
[17] that he acted with deliberate disregard of whether the
[18] statements were true or false or with a conscious purpose to
[19] avoid learning the truth.
[20]     If the government establishes that the defendant
[21] acted with deliberate disregard for the truth, the knowledge
[22] requirement would be satisfied unless the defendant actually
[23] believed the statements to be true. This guilty knowledge,
[24] however, cannot be established by demonstrating that the
[25] defendant was merely negligent or foolish.

**Page 2276**

[1] If you find that the government has established
[2] beyond a reasonable doubt that the defendant participated in
[3] the scheme to defraud knowingly, willfully, and with the
[4] specific intent to defraud, then you should consider the
[5] fourth element.
[6] The final element that the government must prove
[7] beyond a reasonable doubt on these charges is that the
[8] defendant knowingly used or caused to be used the mails.
[9] Interstate telephone communications or communications
[10] in furtherance of the scheme to defraud or the fraudulent
[11] conduct alleged in the indictment.
[12] It is not necessary that the defendant be
[13] directly or personally involved in the mailing. If the
[14] defendant was an active participant in the scheme and took
[15] steps or engaged in conduct which he knew or could
[16] reasonably foresee would naturally and probably result in
[17] the use of the mails or interstate wires, then you may find
[18] that he caused them to be used.
[19] When one does an act with the knowledge that the
[20] use of interstate means of communication will follow in the
[21] ordinary course of business, or where such use can
[22] reasonably be foreseen, even though not actually intended,
[23] then he causes such means to be used.
[24] Nor is it necessary that the items sent through
[25] the mails contain the fraudulent material or anything

**Page 2277**

[1] criminal or objectionable. The matter mailed may be
[2] entirely innocent.
[3] The use of the mails need not be central to the
[4] execution of the scheme and may even be incidental to it.
[5] All that is required is that the use of the mails bear some
[6] relation to the object of the scheme or fraudulent conduct.
[7] I turn now, ladies and gentlemen, to Count 6,
[8] which is closely related to Counts 2 through 5. Count 6
[9] charges the defendant with violating Section 1433 of Title
[10] 18 of the United States Code, which is the federal wire
[11] fraud statute. That section provides in pertinent part:
[12] "Whoever, having devised or intending to devise
[13] any scheme or artifice to defraud or for obtaining money or
[14] property by means of false or fraudulent pretenses,
[15] representations or promises, transmits or causes to be
[16] transmitted by means of wire, radio or television
[17] communications in interstate commerce any writings, signs,
[18] signals, picture or sounds for the purpose of executing such
[19] scheme or artifice, shall be guilty of a crime."
[20] In this case, the defendant is charged with
[21] devising and participating in the same scheme that is the
[22] subject of Counts 2 through 5 of the indictment, a scheme to
[23] defraud clients and prospective clients of Tandem
[24] Management, by distributing false and misleading advertising
[25] materials on behalf of Tandem Management.

**Page 2**

[1] In order to prove the defendant guilty of the
[2] wire fraud count, the government must establish beyond a
[3] reasonable doubt the following three elements:
[4] First, that there was a scheme or artifice to
[5] defraud or obtain money or property by false and fraudulent
[6] pretenses, representations or promises, as alleged in the
[7] indictment at or about the time alleged in the indictment;
[8] Second, that the defendant knowingly and
[9] willfully participated in the scheme or artifice to defraud,
[10] with knowledge of its fraudulent nature and with specific
[11] intent to defraud, and;
[12] Third, in execution of that scheme, the defendant
[13] used, or caused to be used, interstate wire facilities in
[14] furtherance of the scheme as specified in the indictment.
[15] With regard to the first two elements, the
[16] instructions that I've just read to you concerning the
[17] second and third elements of the Investment Advisors Act
[18] charges, Counts 2 through 5, apply here as well: (1) the
[19] existence of a scheme to defraud; and (2) defendant's
[20] knowing and willful participation in the scheme with the
[21] intent to defraud.
[22] I'll now explain the third element of this Count
[23] 6. The third and final element that the government must
[24] establish beyond a reasonable doubt is the use of interstate
[25] wire facilities in furtherance of the scheme to defraud.

**Page**

[1] In this count, the defendant is alleged to have
[2] used wires in furtherance of the scheme by causing a
[3] telefacsimile of a chart purporting to show the historical
[4] rates of return of the short-term, "aggressive trading,"
[5] accounts managed by Tandem to be sent from New York, New
[6] York, to a witness in this case, Robert Barker of the firm
[7] of Smith Barney & Co. in Chestnut Hill, Massachusetts.
[8] Count 6 reads as follows:
[9] 29. The allegations of Paragraphs 1 through 9,
[10] 11 through 12 and 26A through D are repeated and realleged
[11] as though fully set forth herein. I will not reread them.
[12] 30. In or about June 1993, in the Southern
[13] District of New York and elsewhere, William F Branston, the
[14] defendant, unlawfully, willfully and knowingly, having
[15] devised and intending to devise a scheme, an artifice to
[16] defraud and for obtaining money and property by means of
[17] false and fraudulent pretenses, representations and
[18] promises, and for the purpose of executing said scheme and
[19] artifice, did transmit and cause to be transmitted by means
[20] of wire communication in interstate commerce writings,
[21] signs, signals and sounds, namely, a telefacsimile sent from
[22] New York, New York to Chestnut Hill, Massachusetts of a
[23] chart purporting to show the historical rates of return of
[24] the short term, "aggressive trading," accounts managed by
[25] Tandem.

Page 2280

[1] The use of the wire facilities must be between different
[2] states. In this case, as I've said, the indictment alleges
[3] that a telefacsimile transmission was sent from New York to
[4] Massachusetts. The transmitted matter need not contain a
[5] fraudulent representation or purpose or request for money.
[6] It must, however, further or assist in the
[7] carrying out of the scheme to defraud. It is not necessary
[8] for the defendant to be directly or personally involved in
[9] any wire communication as long as the communication was
[10] reasonably foreseeable in the execution of the alleged
[11] scheme to defraud in which the defendant is accused of
[12] participating. This wire communication requirement is
[13] satisfied even if the wire communication was done by a
[14] person with no knowledge of the fraudulent scheme.
[15] In this regard, it is sufficient to establish
[16] this element of the crime if the evidence justifies a
[17] finding that the defendant caused the wires to be used by
[18] others. This does not mean that the defendant must
[19] specifically have authorized others to send a communication
[20] over the wires. When one does an act with knowledge that
[21] the use of the wire will follow in the ordinary course of
[22] business, or where such use of the wires can reasonably be
[23] forseen even though not actually intended, then the
[24] defendant caused the wires to be used.
[25] The government must establish beyond a reasonable

Page 2281

[1] doubt the particular use charged in the indictment.
[2] However, the government does not have to prove that the wire
[3] was used on the exact date charged in the indictment. It is
[4] sufficient that the evidence establishes beyond a reasonable
[5] doubt that the wire was used on a date substantially similar
[6] to the date charged in the indictment.
[7] I now turn to Count 7 of the indictment, the
[8] final charge relating to the alleged fraudulent marketing
[9] scheme. Count 7 charges the defendant with violating the
[10] Investment Advisors Act through conduct prohibited by a
[11] Securities & Exchange Commission rule that bars false
[12] advertising by investment advisors. The provision of the
[13] Investment Advisors Act that is alleged to have been
[14] violated, Section 206 (4), provides in pertinent part as
[15] follows:
[16] "It shall be unlawful for any investment advisor,
[17] by the use of the mails or any other means or
[18] instrumentality of interstate commerce, directly or
[19] indirectly, to engage in any act, practice or course of
[20] business which is fraudulent, deceptive or manipulative."
[21] The Securities & Exchange Commission's false
[22] advertising rule provides, in pertinent part, as follows:
[23] "It shall constitute a fraudulent, deceptive or
[24] manipulative act, practice or course of business within the
[25] meaning of Section 206 (4) of the Investment Advisors Act

Page 2282

[1] for any investment advisor, directly or indirectly, to
[2] publish, circulate or distribute any advertisement which
[3] contains any untrue statement of a material fact or which is
[4] otherwise false and misleading."
[5] Now, this count, Count 7 of the indictment, reads
[6] as follows:
[7] 31. The allegations of Paragraphs 1 through 9,
[8] Paragraph 11 C are repeated and realleged as though fully
[9] set forth herein.
[10] 32. In or about 1994, in the Southern District
[11] of New York and elsewhere, William F. Branston, the
[12] defendant, unlawfully, willfully and knowingly did cause
[13] Tandem, by use of the mails and of other means and
[14] instrumentalities of interstate commerce, directly and
[15] indirectly, to engage in acts, practices and courses of
[16] business which were fraudulent, deceptive and manipulative,
[17] by directly and indirectly publishing, circulating and
[18] distributing, in contravention of Title 17, Code of Federal
[19] Regulations, Section 275.206 (4) through 1(A)(5), an
[20] advertisement that contained untrue statements of untrue
[21] fact and that was otherwise false and misleading; namely, a
[22] brochure prepared for the purpose of promoting investment in
[23] the Parallax Fund, Limited, that falsely represented the
[24] historical rates of return of technical pattern trading
[25] accounts managed by Tandem, the value of assets managed by

Page 2283

[1] Tandem in technical pattern trading accounts, and the
[2] aggregate value of client assets managed by Tandem.
[3] Now, to find the defendant guilty of violating
[4] the Investment Advisors Act through false advertising, the
[5] government must establish beyond a reasonable doubt the
[6] following four elements:
[7] First, that Tandem was an investment advisor;
[8] Second, that the defendant, acting on behalf of
[9] Tandem, participated, directly or indirectly, in publishing,
[10] circulating or distributing an advertisement which contains
[11] an untrue statement of material fact, or which is otherwise
[12] false or misleading as to a material fact;
[13] Third, that the defendant participated in
[14] publishing, circulating or distributing the false or
[15] misleading advertisement knowingly and willfully; and
[16] Fourth, that the conduct violating the rule
[17] involved the use of the mails or any means or
[18] instrumentality of interstate commerce.
[19] For the purposes of this rule, the term
[20] "advertisement" includes any notice, circular, letter or
[21] other written communication addressed to more than one
[22] person or any notice or other announcement in any
[23] publication over radio or television which offers any
[24] investment advisory service with regard to securities.
[25] I have already explained to you the other terms

Page 2284

[1] and concepts relevant to this charge, including the meaning
[2] of "investment advisor," "material fact," "False or
[3] misleading statement," "willful and knowing" conduct and of
[4] using the mails and instrumentalities of interstate
[5] commerce.
[6]    In addition, what I've said about the requirement
[7] of participation in a fraudulent scheme also holds true for
[8] this charge. It is not necessary that a participant be
[9] someone who personally and visibly circulates or distributes
[10] a false or misleading advertisement. It is sufficient if
[11] you find that the defendant caused the making of a false or
[12] misleading statement, with knowledge that it was false or
[13] misleading, or that he knowingly and intentionally aided and
[14] abetted another person in making a false or misleading
[15] statement.
[16]    Moreover, in proving the defendant's knowledge of
[17] the falsity of the statement contained in the relevant
[18] advertisement, the government can also meet its burden of
[19] proof by establishing beyond a reasonable doubt that the
[20] defendant acted with deliberate disregard of whether the
[21] statement was true or false or with a conscious purpose to
[22] avoid learning the truth, as I've already explained those
[23] terms to you.
[24]    In this case, the indictment charges that the
[25] alleged advertisement contained three misrepresentations:

Page 2285

[1]    First, the historical rates of return of
[2] technical pattern trading accounts managed by Tandem;
[3]    Second, the value of assets managed by Tandem in
[4] technical pattern trading accounts; and
[5]    Third, the aggregate value of client assets
[6] managed by Tandem.
[7]    For the purpose of determining whether the
[8] government has satisfied its burden in proving that the
[9] defendant had the requisite knowledge of the falsity of the
[10] advertisement, you need not find that he knew that all three
[11] representations were false and misleading. It is sufficient
[12] if you find that the defendant had the requisite knowledge
[13] of one false or misleading statement with respect to a
[14] material fact. You must all agree, however, on which
[15] material fact or facts were knowingly
[16] misstated.
[17]    I now turn, ladies and gentlemen, to the
[18] substantive charges of the indictment relating to the
[19] alleged soft-dollar scheme, Counts 8 through 12.
[20]    Counts 8 through 11 charge the defendant with
[21] violating Section 206 of the Investment Advisors Act, and
[22] Count 12 charges the defendant with violating the federal
[23] wire fraud statute. I have already read to you the relevant
[24] portions of those laws. I will now read to you Counts 8
[25] through 11 of the indictment.

Page 2

[1]    33. The allegations of Paragraphs 1 through 9,
[2] 13 through 21, and 26 E through G, are repeated and
[3] realleged as though fully set forth herein.
[4]    34. On or about the dates set forth below, in
[5] the Southern District of New York and elsewhere, William F.
[6] Branston, the defendant, unlawfully, willfully and knowingly
[7] did cause Tandem, by the use of the mails or other means and
[8] instrumentalities of interstate commerce, directly and
[9] indirectly to:
[10]    A: Employ devices, schemes and artifices to
[11] defraud the following clients;
[12]    B. To engage in transactions, practices or
[13] courses of business which operated as a fraud and deceit
[14] upon the following clients; and
[15]    C. Engage in acts, practices and courses of
[16] business which were fraudulent, deceptive and manipulative.
[17]    Count 8. The client is alleged to be Oxbridge
[18] Associates, LP. The approximate time period of the
[19] misappropriation is October 1993 through June of 1994.
[20]    Count 5. The client is Peter Greenfield. The
[21] approximate time period of misrepresentation is October 1993
[22] through October 1994.
[23]    Count 10. MLR&R Partners. The approximate time
[24] period is June 1992 through January 1994.
[25]    Count 11. Pooled Employee Trust Fund of Bank of

Page 2

[1] Boston Growth Equity Fund. Time period is June 1993 through
[2] August of 1994.
[3]    Count 12 reads as follows:
[4]    35. The allegations of Paragraphs 1 through 9,
[5] 13 through 21, and 26 E through G, are repeated and
[6] realleged as though fully set forth herein.
[7]    36. On or about February 26, 1993, in the
[8] Southern District of New York and elsewhere, William F.
[9] Branston, the defendant, unlawfully, willfully and
[10] knowingly, having devised and intending to devise a scheme
[11] and artifice to defraud, and for obtaining money and
[12] property by means of false and fraudulent pretenses,
[13] representations and promises, and for the purpose of
[14] executing said scheme and artifice, did transmit or cause to
[15] be transmitted by means of wire communication in interstate
[16] commerce, writings, signs, signals and sounds; namely, a
[17] telefacsimile from New York, New York to Dallas, Texas, of a
[18] letter that instructed Capital to reimburse Tandem using
[19] soft-dollar credits of Tandem's clients, for an invoice
[20] issued by Standard & Poor's Compustat Services, in the
[21] amount of $13,801.87.
[22]    In instructing you on the charges relating to the
[23] alleged fraudulent marketing scheme, I explained the
[24] elements of a violation of Section 206 of the Investment
[25] Advisors Act and the federal wire fraud statute. The same

Page 2288

[1] elements must be established beyond a reasonable doubt to
[2] find the defendant guilty of an Investment Advisors Act or
[3] wire fraud charge relating to the alleged soft-dollar
[4] scheme.
[5]     However, there are differences between the
[6] allegations of the marketing fraud scheme and the
[7] soft-dollar scheme that require some additional explanation.
[8]     (Continued on next page)
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 2289

[1]     The marketing fraud scheme is based upon explicit
[2] misrepresentations alleged to have been made in brochures
[3] and other marketing materials distributed on behalf of
[4] Tandem Management. The soft-dollar scheme is based upon
[5] alleged implicit and explicit misrepresentations, as well as
[6] on other alleged violations of duties of disclosure and
[7] candor that the defendant owed to clients of Tandem
[8] Management in his capacity as a fiduciary of those clients.
[9] The allegations relating to the scheme are as follows.
[10]     First, the indictment alleges that the Form ADV
[11] publicly filed on behalf of Tandem Management misrepresented
[12] that the firm selected brokers for its clients and
[13] determined the reasonableness of their commissions in
[14] accordance with Section 28(e) of the Securities Exchange Act
[15] of 1934. I have already read to you the alleged
[16] representations contained in the Form ADV on that subject.
[17]     Section 28(e) provides that an investment advisor
[18] may cause an account managed by the advisor "to pay [a]
[19] broker . or dealer [of securities] an amount of
[20] commission for effecting a securities transaction in excess
[21] of the amount of commission another . broker . or
[22] dealer would have charged for effecting that transaction, if
[23] [the investment advisor] determined in good faith that such
[24] amount of commission was reasonable in relation to the value
[25] of the brokerage and research services provided by such

Page 2290

[1] . broker . or dealer, viewed in terms of either
[2] that particular transaction or [the advisor's] overall
[3] responsibilities with respect to the accounts as to
[4] which he exercises investment discretion."
[5]     The indictment alleges that the representations
[6] contained in the Form ADV were false and misleading in that
[7] the Form ADV failed to disclose to clients and prospective
[8] clients: (1) that most of the soft-dollar credits paid by
[9] Tandem's client were converted to the personal benefit of
[10] Tandem's employees and were not used to pay expenses related
[11] to Tandem's investment advisory business; (2) that tandem
[12] used soft-dollar credits paid for by its clients for
[13] purposes other than obtaining "such research services as
[14] fundamental analyses of the economy, the political
[15] environment, the financial markets, specific industries,
[16] and/or individual securities," including payment of its
[17] office rent, legal fees and other operating expenses; and
[18] (3) that Tandem caused its clients to pay higher brokerage
[19] commissions to Sherwood Securities in order to generate cash
[20] rebates for the benefit of Tandem and its employees.
[21]     Second, the indictment alleges that an investment
[22] advisory agreement provided to clients of Tandem Management
[23] misrepresented how the defendant and other principals of
[24] Tandem intended to use commissions that Tandem Management
[25] caused its clients to pay brokers for executing purchases

Page 2291

[1] and sales of securities. I have already read to you the
[2] indictment's allegations on this subject.
[3]     Third, the indictment alleges that the defendant
[4] violated fiduciary duties owed to the clients of Tandem
[5] Management by participating in the misappropriation of
[6] soft-dollar credits managed in trust on behalf of Tandem
[7] Management's clients.
[8]     There is one other concept which I have not
[9] previously explained to you, the concept of a "fiduciary
[10] capacity." One acts in a "fiduciary capacity" when the
[11] business which he transacts, or the money or property which
[12] he handles, is not his own or for his own benefit, but for
[13] the benefit of another person as to whom he stands in a
[14] relation implying and necessitating great confidence and
[15] trust on the one part and a high degree of good faith on the
[16] other part. A fiduciary relationship involves discretionary
[17] authority and dependency – one person depends on another –
[18] the fiduciary – to serve his interests. In relying on a
[19] fiduciary to act for his benefit, the beneficiary of a
[20] relation may entrust the fiduciary with custody over
[21] property of one sort or another. The question of whether a
[22] fiduciary relationship existed between the defendant and the
[23] clients of Tandem Management is a question of fact for you
[24] to decide.
[25]     Because the fiduciary obtains access to property

[1] of another to serve the ends of the fiduciary relationship,
[2] a person who voluntarily undertakes to act as another's
[3] fiduciary tacitly represents that, except as disclosed to
[4] the other person, he intends to act solely for the interest
[5] of the other person with respect to the property entrusted
[6] to him and will not appropriate the property for his own
[7] use. Moreover, the law imposes on one who undertakes to act
[8] as another's fiduciary an affirmative duty to disclose fully
[9] and frankly to his client any financial interest of the
[10] fiduciary in the transactions or business conducted on
[11] behalf of the other person. A person (i) who deceives
[12] another into entrusting property to him on the false
[13] pretense that he will manage the property solely for the
[14] other person's interest, or (ii) who deliberately fails to
[15] disclose to the person for whom he acts as fiduciary his own
[16] fiduciary interest in the transactions or business which he
[17] conducts in a fiduciary capacity for that person has engaged
[18] in a form of deceit or misrepresentation.
[19]     You need not find that the scheme was devised or
[20] carried out in all the ways alleged in the indictment –
[21] i.e., through false or misleading representations in a Form
[22] ADV; false or misleading representations in an investment
[23] advisory agreement; or breaches of duties of disclosure and
[24] candor owed by a fiduciary to its principal. To satisfy the
[25] "scheme to defraud" element of the charges, however, you

[1] must find beyond a reasonable doubt that a scheme to defraud
[2] existed as I have instructed you and that it was devised or
[3] carried out in at least one of the ways alleged in the
[4] indictment. And, just as with every element I have
[5] previously described to you, you must unanimously agree on
[6] at least one of the ways in which it was devised or carried
[7] out.
[8]     Counts 13 through 15 charge the defendant with
[9] making false and misleading statements on registration
[10] applications and amendments thereto filed with the
[11] Securities and Exchange Commission. Those charges read as
[12] follows:
[13]     "37. The allegations of paragraphs 1 through 9,
[14] and 11 through 21 are repeated and realleged as though fully
[15] set forth herein.
[16]     "38. On or about the dates set forth below, in
[17] the Southern District of New York, William F. Branston, the
[18] defendant, unlawfully, willfully, and knowingly did make
[19] untrue statements of material fact, and omit to state
[20] material facts which were required to be stated in the
[21] following registration applications on Forms ADV filed with
[22] the Securities and Exchange Commission under Title 15,
[23] United States Code, Sections 80b-3 and 80b-4, and Title 17,
[24] Code of Federal Regulations, Section 275.203-1:
[25]     "Count 13; date of Form ADV, March 25, 1992;

[1] approximate filing date, March 30, 1992; Form ADV item
[2] number, 12A/12B, Schedule F; subject of misstatement,
[3] brokerage commission/use of 'soft-dollar' rebates.
[4]     "Count 14; date of form ADV, March 29, 1993;
[5] filed approximately June 1, 1993; Form ADV item number, 18B;
[6] subject of the misstatement, aggregate value of securities
[7] portfolios that Tandem managed for clients.
[8]     "Count 15; Form ADV dated April 11, 1994; filed
[9] approximately April 25, 1994; item 18B; subject, aggregate
[10] value of securities portfolios that Tandem managed for
[11] clients."
[12]     The relevant statute on this subject is Section
[13] 207 of the Investment Advisors Act, which provides, in
[14] relevant part: "It shall be unlawful for any person
[15] willfully to make any untrue statement of a material fact in
[16] any registration application or report filed with the
[17] [Securities and Exchange] Commission under Section 203, or
[18] 204 of this Act, or willfully to omit to state in any such
[19] application or report any material fact which is required to
[20] be stated therein."
[21]     Section 203 of the Investment Advisors Act
[22] requires investment advisors to register with the Securities
[23] and Exchange Commission and provides that they may register
[24] by filing with the SEC an application on a form prescribed
[25] by SEC. By rule, the SEC requires the filing of a Form ADV

[1] setting forth certain categories of information concerning
[2] the investment advisor.
[3]     After explaining the purpose of this statute, I
[4] will review with you the elements that you must consider in
[5] determining whether the defendant violated this statute.
[6]     The purpose of the false statement law is to
[7] protect the authorized functions of the Securities and
[8] Exchange Commission from any type of misleading or deceptive
[9] practice and from the adverse consequences that might result
[10] from such deceptive practices. To establish a violation of
[11] the false statements law, it is necessary for the government
[12] to prove certain elements – which I will describe for you
[13] in a moment – beyond a reasonable doubt. However, I want
[14] to point out now that it is not necessary for the government
[15] to prove that the SEC or any investor was, in fact, misled
[16] as a result of the defendant's action. It does not matter
[17] if the SEC was not misled, or even if it knew of the
[18] misleading or deceptive act, should you find that the act
[19] occurred. These circumstances would not excuse the
[20] commission of this crime.
[21]     In order to find the defendant guilty of
[22] violating Section 207, you must find that the government has
[23] proved each of the following two elements beyond a
[24] reasonable doubt:
[25]     First, that on or about the date specified in the

Page 2296

[1] indictment, the government defendant either made an untrue
[2] statement with respect to a material fact on a registration
[3] application filed with the SEC; omitted to state any
[4] material fact which was required to be stated on the
[5] application; or aided and abetted another person in making
[6] such untrue statements or omissions; and
[7] Second, that the defendant acted unlawfully,
[8] willfully, and knowingly in making the untrue statement or
[9] omission or in aiding and abetting someone else to do so.
[10] I have already explained most of these concepts
[11] and terms to you in the context of the other instructions,
[12] and the same definitions and rules apply to this charge.
[13] In instructing you on all of the substantive
[14] counts of the indictment that I have discussed so far –
[15] Counts 2 through 15 (but note particularly, not Count 1, the
[16] conspiracy charge) – I have made mention of "aiding and
[17] abetting." With respect to Counts 2 through 15, the
[18] indictment also charges the defendant with what is called
[19] "aiding and abetting." The aiding and abetting statute,
[20] Section 2(a) of Title 18 of the United States Code, provides
[21] that:
[22] "Whoever commits an offense against the United
[23] States or aids, abets, counsels, commands, induces or
[24] procures its commission, is punishable as a principal."
[25] Under the aiding and abetting statute, it is not

Page 2297

[1] necessary for the government to show that the defendant
[2] himself physically committed the crime with which he is
[3] charged in order for you to find the defendant guilty.
[4] Thus, if you do not find beyond a reasonable doubt that the
[5] defendant himself committed the crime charged, you may,
[6] under certain circumstances, still find that defendant
[7] guilty of that crime as an aider and abettor.
[8] A person who aids or abets another to commit an
[9] offense is just as guilty of that offense as if he committed
[10] it himself. Accordingly, you may find a particular
[11] defendant guilty of the substantive crime if you find beyond
[12] a reasonable doubt that the government has proved that
[13] another person actually committed the crime, and that the
[14] defendant aided and abetted that person in the commission of
[15] the offense.
[16] As you can see, the first requirement is that
[17] another person has committed the crime charged. Obviously,
[18] no one can be convicted of aiding and abetting the criminal
[19] acts of another if no crime was committed by the other
[20] person in the first place. But if you find that a crime was
[21] committed, then you must consider whether the defendant
[22] aided or abetted the commission of the crime.
[23] In order to aid or abet another to commit a
[24] crime, it is necessary that the defendant willfully and
[25] knowingly associate himself in some way with the crime, and

Page 2298

[1] that he willfully and knowingly seek by some act to help
[2] make the crime succeed.
[3] Participation in a crime is willful if the action
[4] is taken voluntarily and intentionally, or, in the case of a
[5] failure to act, with the specific intent to fail to do
[6] something the law requires to be done; that is to say, with
[7] a bad purpose either to disobey or disregard the law.
[8] The mere presence of a defendant where a crime is
[9] being committed, even coupled with knowledge by the
[10] defendant that a crime is being committed, or the mere
[11] acquiescence by a defendant in the criminal conduct of
[12] others, even with guilty knowledge, is not sufficient to
[13] establish aiding and abetting. An aider and abettor must
[14] have some interest in the criminal venture.
[15] To determine whether a defendant aided or abetted
[16] the commission of the crime with which he is charged, ask
[17] yourself these questions: Did he participate in the crime
[18] charged as something he wished to bring about? Did he
[19] associate himself with the criminal venture knowingly and
[20] willfully? Did he seek by his actions to make the criminal
[21] venture succeed?
[22] If he did, then the defendant is an aider and
[23] abettor, and therefore guilty of the offense.
[24] If, on the other hand, your answer to any of
[25] these questions is no, then the defendant not an aider and

Page 2299

[1] abettor, and you must find him not guilty.
[2] THE COURT: Let's take a quick break here.
[3] (Pause)
[4] THE COURT: Thank you for being so attentive. We
[5] don't have that much more to go.
[6] I now turn to the final count of the indictment,
[7] Count 16. Count 16 charges the defendant with committing
[8] perjury in testimony before the Securities and Exchange
[9] Commission. Count 16 reads as follows:
[10] "39. The allegations of paragraphs 1 through 9,
[11] 13 through 19, and 26e-g are repeated and realleged as
[12] though fully set forth herein.
[13] "40. In or about September 1994, the examination
[14] staff of the SEC conducted an on-site examination of certain
[15] books and records of Tandem. As a result of information
[16] obtained during that examination, the SEC's northeast
[17] regional office located in New York, New York commenced an
[18] investigation to determine, among other things, whether
[19] William F. Branston, the defendant, and others had violated
[20] the laws of the United States, including by committing fraud
[21] in violation of Title 15, United States Code, Sections
[22] 80b-6.
[23] "41. As that investigation progressed, it was
[24] material to the SEC's investigation to determine, among
[25] other things, whether William F. Branston, the defendant,

Page 2300

[1] had any knowledge of, or role in, Tandem's policies and
[2] practices with respect to obtaining reimbursement from
[3] securities brokers for 'soft-dollar' services.
[4]    "42. On or about May 25, 1995, in the Southern
[5] District of New York, William F. Branston, the defendant,
[6] having taken an oath before a competent tribunal, officer,
[7] and person, in a case in which a law of the United States
[8] authorized an oath to be administered, that he would
[9] testify, declare, depose, and certify truly, did appear
[10] before the SEC at the SEC's northeast regional office in New
[11] York, New York, and unlawfully, willfully, and knowingly,
[12] and contrary to his oath, did make the declarations
[13] underscored below which were material to the SEC's
[14] investigation and which Branston did not believe to be true:
[15]    "Q. Did you ever send a bill to a soft-dollar
[16] broker that you knew had already been paid or reimbursed by
[17] another broker or by that same broker?
[18]    "A. Not intentionally, no.
[19]    "Q. Did you ever direct anyone else to send a
[20] bill to a soft-dollar broker that had already been paid or
[21] reimbursed by another broker or the same broker?
[22]    "A. No.
[23]    "Q. Did you ever learn that Tandem had
[24] received payment more than once for particular bills prior
[25] to the time of the SEC examination of Tandem in 1994?

Page :

[1] whom oaths are administered, such as the Securities and
[2] Exchange Commission. Witnesses appearing before such
[3] bodies, whether voluntarily or under the compulsion of a
[4] subpoena, take an oath to tell the truth, the whole truth,
[5] and nothing but the whole truth, just as you have heard that
[6] oath administered in this courtroom to every witness who
[7] testified before you.
[8]    Once under such an oath, the witness is bound to
[9] tell what he knows in answer to the question asked, for the
[10] purpose of bringing out the truth of the matter under
[11] inquiry.
[12]    (Continued on next page)
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 2301

[1]    "A. No.
[2]    "Q. Did you learn that during the SEC
[3] examination in 1994?
[4]    "A. Yes."
[5] Perjury is a violation of 18 U.S.C. Section 1621,
[6] which provides in pertinent part as follows:
[7]    "Whoever having taken an oath before a competent
[8] tribunal, officer, or person, in any case in which a law of
[9] the United States authorizes an oath to be administered,
[10] that he will testify, declare, depose, or certify truly
[11] . . . willfully and contrary to such oath states or
[12] subscribes any material matter which he does not believe to
[13] be true, [is guilty of a crime]."
[14]    I instruct you that the law of the United States
[15] authorizes an oath to be administered in an investigation
[16] conducted by the Securities and Exchange Commission.
[17]    The administration of justice depends upon
[18] respect for the sanctity of an oath. Essential to the
[19] administration of justice and the enforcement of the laws is
[20] that those called upon to testify before competent tribunals
[21] empowered by law to administer oaths give truthful
[22] testimony.
[23]    This federal court is such a tribunal, and there
[24] are other such bodies, such as a grand jury or a regular
[25] jury, like yours, as well as other official bodies before

Page 2

[1]    Simply stated, perjury is the willful giving of
[2] false testimony before a competent tribunal while under oath
[3] knowing the testimony is false as to a material matter.
[4]    In order to prove the perjury charge against the
[5] defendant, the government must establish beyond a reasonable
[6] doubt each of the following four elements:
[7]    First, that the defendant took an oath to testify
[8] truthfully before the Securities & Exchange Commission, a
[9] body authorized by law to administer oaths;
[10]    Second, that the defendant made false statements
[11] as to matters about which the defendant testified under oath
[12] as set forth in the indictment;
[13]    Third, that such false statements were willfully
[14] made, in that at the time the defendant made these
[15] statements, the defendant knew them to be false; and
[16]    Fourth, that the matters as to which it is
[17] charged the defendant made false statements were material to
[18] the issues under inquiry by the Securities & Exchange
[19] Commission.
[20]    In order to prove the first element, the
[21] government need only show that the defendant was placed
[22] under oath to tell the truth when the testimony was given.
[23] Here the government alleges that the defendant appeared
[24] before a notary public on the staff of the Securities &
[25] Exchange Commission on May 25, 1995 and took an oath on tha

Page 2304

[1] day to testify truthfully.

[2] The second element the government must prove
[3] beyond a reasonable doubt is the falsity of the testimony in
[4] question. You must determine whether the testimony
[5] underlined in the indictment was false. An answer to a
[6] question is false when it is contrary to fact; that is, when
[7] it's not true.

[8] The truth or falsity of an answer must be
[9] determined by the facts existing at the time the answer was
[10] made. In reviewing the testimony which is alleged to have
[11] been false, you should consider such testimony in the
[12] context of the sequence of questions asked and answers
[13] given. The words used should be given their common and
[14] ordinary meaning unless the context shows that a different
[15] meaning was understood by both the questioner and the
[16] witness. The burden is on the government to establish
[17] beyond a reasonable doubt that the declarations or answers
[18] made by the defendant were, in fact, false.

[19] Count 16 contains answers given by the defendant
[20] reciting more than one fact. It is not necessary that the
[21] government prove that each of these factual statements is
[22] false. The government satisfies its burden of proving
[23] falsity if it proves beyond a reasonable doubt that any of
[24] the factual statements recited in Count 16 is false.

[25] However – and this is important – you may not

Page 2305

[1] find the defendant guilty unless you all agree unanimously
[2] that one particular answer is false. It's not enough that
[3] you all believe that some answer given by the defendant is
[4] false; that is, you cannot find the defendant guilty if some
[5] of you think that only Answer A is false and the rest of you
[6] think that only Answer B is false. There must be at least
[7] one specific answer that all of you believe is false in
[8] order to convict the defendant.

[9] If you should find that a particular question was
[10] ambiguous; that is, subject to more than one interpretation,
[11] and that the defendant truthfully answered one reasonable
[12] interpretation of that question under the circumstances
[13] presented, then such an answer would not be false.

[14] Similarly, if you should find that the question
[15] was clear, but the answer was ambiguous, and one reasonable
[16] interpretation of such answer would be truthful, then such
[17] answer would not be false.

[18] In deciding whether the defendant's answers are
[19] false, the answers must be given their natural meaning in
[20] the context in which the words were used. If you find that
[21] an answer given by the defendant was literally true but
[22] unresponsive to the question asked, you may not find that
[23] answer false or convict the defendant because of it. As
[24] long as a statement or a reasonable interpretation of a
[25] statement is narrowly or literally true, there can be no

Page 2306

[1] conviction for perjury. This is so even if you find the
[2] answer was intentionally misleading.

[3] Now I've instructed you that the government must
[4] establish beyond a reasonable doubt that the defendant's
[5] answers were false. The law has a special rule for the
[6] amount of proof required to show that the defendant's
[7] statements were false. Simply put, the rule is that in
[8] order to convict the defendant of perjury, the falsity of
[9] the defendant's statements must be established either by the
[10] testimony of two witnesses whose testimony you, the jury,
[11] believe to be true or by the testimony of one such witness
[12] which is corroborated or confirmed by other independent
[13] evidence, such as documentary evidence, which you believe
[14] and which you find to be trustworthy and to substantiate the
[15] testimony of that witness.

[16] "Independent" means something other than and in
[17] addition to the testimony of the one witness. When I say
[18] that the falsity of the defendant's statements must be
[19] established, I mean that the falsity of the set of facts
[20] which the defendant stated must be established. The witness
[21] or witnesses whose testimony is offered to establish this
[22] falsity need not – and in most cases will not – know what
[23] the defendant's actual statement was or even whether the
[24] defendant gave such statements at all.

[25] Where the falsity of facts which the defendant

Page 2307

[1] stated is established by the testimony of one witness and
[2] other independent evidence which corroborates or confirms
[3] that witness' testimony, the rule does not require that the
[4] corroborative evidence itself prove guilt. The rule is
[5] satisfied when there is direct testimony from one witness
[6] and some additional independent evidence so corroborative of
[7] this direct testimony that the two when considered together
[8] are sufficient to establish the falsity of the defendant's
[9] statements beyond a reasonable doubt.

[10] The rule requires the government to prove in
[11] evidence something more than one witness. Thus, if one
[12] witness testifies under oath as to certain facts and at a
[13] later date another person testifies to the contrary, the
[14] testimony of the second individual alone without any other
[15] corroborating evidence would not be sufficient to convict
[16] the first person of perjury.

[17] To support a conviction, the government must
[18] produce either a second witness or independent evidence that
[19] corroborates a second witness' testimony establishing the
[20] falsity of the facts which the defendant stated.

[21] If you decide that any of the answers the
[22] defendant gave were false, then you must then decide whether
[23] the defendant gave that answer or those answers knowingly
[24] and willfully; that is, at the time the answers were given,
[25] did the defendant know and believe that those answers were

Page 2308

[1] false and, if so, did the defendant give the false answers
[2] consciously and in the exercise of his free will.
[3]     Unless you find beyond a reasonable doubt that
[4] the defendant both knew that an answer was false and that he
[5] purposefully or intentionally gave a false answer, you may
[6] not find the defendant guilty with respect to that answer.
[7]     The requirement that you find the defendant acted
[8] knowingly and willfully means that you may not find the
[9] defendant guilty of perjury simply because the defendant
[10] gave testimony which is factually incorrect. The defendant
[11] may have given incorrect testimony because of an honest
[12] mistake of facts, confusion, haste, oversight or
[13] carelessness.
[14]     If the defendant made an erroneous and incorrect
[15] statement, if it was through a slip of a tongue, or bad
[16] memory, or through misunderstanding, the defendant would not
[17] be guilty of making a false statement knowingly and
[18] willfully.
[19]     Your decision whether the defendant acted
[20] knowingly and willfully in making any misstatement you find
[21] to be false involves a decision about the defendant's state
[22] of mind at the time the statements were made. It is
[23] obviously impossible to ascertain or to prove directly what
[24] the operation of the defendant's mind was. You certainly
[25] can't look into a person's mind and see what his state of

Page 2

[1]     You may consider whether the defendant had a
[2] motive to lie and conceal the facts. The government is not
[3] required to prove the existence of such a motive, let alone
[4] exactly what the motive was. The government's failure to
[5] prove a motive does not establish lack of guilt, but if you
[6] do find evidence of a motive, that may help you decide what
[7] the defendant's state of mind was. Therefore, you should
[8] ask yourselves whether the defendant stood to gain any
[9] personal benefit from concealing the truth or whether he
[10] stood to avoid any personal liability.
[11]     The fourth element that you must find beyond a
[12] reasonable doubt is materiality. You must find that the
[13] matters as to which the defendant gave false testimony were
[14] material to the issues under investigation by the Securities
[15] & Exchange Commission. Materiality is demonstrated if the
[16] question posed is such that a truthful response could
[17] potentially have aided the Securities & Exchange
[18] Commission's investigation and a false answer could
[19] potentially have hindered the investigation.
[20]     Put another way, if the false testimony was
[21] capable of influencing the inquiry or investigation of the
[22] Commission, or had a natural effect or tendency to impede or
[23] dissuade the Commission from pursuing aspects of its
[24] investigation, then the false testimony is material.
[25]     Thus, the government is not required to

Page 2309

[1] mind is or was, but a wise and intelligent consideration of
[2] all the facts and circumstances shown by the evidence and
[3] the exhibits in the case may enable you to infer with a
[4] reasonable degree of accuracy what the defendant's state of
[5] mind was.
[6]     In our everyday affairs we are continuously
[7] called upon to decide from the actions of others what their
[8] state of mind is. Experience has taught us that frequently
[9] actions speak louder than words, more clearly than spoken or
[10] written words. Therefore, you may well rely in part on
[11] circumstantial evidence in determining the defendant's state
[12] of mind.
[13]     Proof of the circumstances surrounding the
[14] defendant's action can supply an adequate basis for finding
[15] that the defendant acted knowingly and willfully. The
[16] actions of an individual must be set in their time and
[17] place. The meaning of a particular act may depend on
[18] circumstances surrounding it.
[19]     Thus, you may consider the evidence which you
[20] recall and believe about the defendant's actual knowledge of
[21] certain facts and occurrences as compared to the testimony
[22] he gave about the facts and occurrences, the extent to which
[23] statements were made to conceal facts and in general the
[24] manner in which certain actions were undertaken by the
[25] defendant and by others with his knowledge.

Page 2

[1] demonstrate that the false testimony actually impeded the
[2] Commission's investigation or even that the false testimony
[3] probably impeded the investigation. Materiality must be
[4] decided in full context; the issue does not turn simply on
[5] whether a particular question standing alone could have
[6] evoked a material reply.
[7]     Now, under your oath as jurors, you cannot allow
[8] considerations of punishment that might be imposed upon a
[9] defendant, if convicted, to influence your verdict in any
[10] way or in any sense to permit it to enter into your
[11] deliberations, nor should you allow any opinions you might
[12] have about the nature of the crimes charged to enter into
[13] your deliberations. Your function is to weigh the evidence
[14] in the case and to determine your verdict as to the
[15] defendant on the basis of the evidence and upon the law as
[16] I've instructed you.
[17]     You must not be influenced by any assumption,
[18] conjecture or sympathy or any inference not warranted by the
[19] facts. Your concern is to determine whether or not, with
[20] respect to each count on the evidence before you, the guilt
[21] of the defendant has or has not been proved beyond a
[22] reasonable doubt.
[23]     If you fail to find beyond a reasonable doubt
[24] that the law has been violated by the defendant, you should
[25] not hesitate for any reason to return a verdict of

Page 2316

[1]    (At side bar)

[2]    **THE COURT:** Ladies and gentlemen, comments?

[3]    **MR. ROSS:** Judge, we just reiterate our previous

[4] objection to the lack of a handwriting expert charge and the

[5] lack of convergence charge simply for the record.

[6]    **THE COURT:** Thank you, Mr. Ross.

[7] The government?

[8]    **MR. OWENS:** We have only one comment, your Honor.

[9]    We think it might speed the jury's deliberations

[10] and the notes that might come out for exhibits if your Honor

[11] allows the jurors if they wish to take back the binders and

[12] other copies of exhibits we have distributed to them for use

[13] in their deliberations, since the contents are in evidence,

[14] and it may just speed things along and save us a lot of time

[15] having to respond to notes for individual documents.

[16]    **MR. ROSS:** Judge, I think we ought to rely on the

[17] jury's discretion and decision in this area and simply await

[18] notes, if any, for particular exhibits. I think Mr. Owens'

[19] suggestion to provide a selection of exhibits –

[20]    **THE COURT:** We'll wait for notes.

[21] Anything else?

[22]    **MS. CARVLIN:** No.

[23]    **MR. CANELLOS:** No your Honor.

[24]    (Continued on next page)

[25]

Page 2

[1]    **MR. ROSS:** Judge, may I just say something to

[2] you off the record?

[3]    **THE COURT:** Yes, sir.

[4]    (Off-the-record discussion)

[5]    (Luncheon recess)

[6]    (Adjourned to April 29, 1998)

[7]

[8]

[9]

[10]

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

Page 2317

[1]    (In open court)

[2]    **THE COURT:** Ladies and gentlemen, we have

[3] concluded the instructions on the law. As you know, you may

[4] take with you your copy of the charge. Ms. Siwik will bring

[5] into you a copy of the indictment and several copies of the

[6] verdict form for your use.

[7]    The manner in which you conduct your

[8] deliberations is up to you. As you know, your lunches are

[9] there. It is our plan to work today until approximately

[10] 4:00 o'clock, at which point we'll go home, you will return

[11] at whatever time you desire in the morning, and you'll work

[12] till whatever time you need to tomorrow as you see fit. It

[13] is all up to you. Thank you for your attention, ladies and

[14] gentlemen. You may take your charges in, you may leave your

[15] binders here. As I mentioned to you in the charge, there is

[16] a method for asking for exhibits. Would you wait one

[17] moment, please.

[18]    (The marshal was duly sworn)

[19]    **THE CLERK:** The alternate jurors are discharged

[20] at this time. You may go into your jury room and get your

[21] belongings.

[22]    **THE COURT:** Thank you, ladies and gentlemen.

[23]    (The jury left the courtroom at exactly 1:40 pm

[24] to begin deliberations)

[25]    **THE COURT:** Anything further, counsel?