DOWD, J.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | CASE NO. 1:07 CR 339 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MEMORANDUM OPINION AND |
| | ) | ORDER |
| Mark D. Lay, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

(1:07 CR 339)

TABLE OF CONTENTS

I. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. A Time Line of Events in this Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III. Applicable Law - Standard of Review for Rule 29 and Rule 33 Motions . . . . . . . . . . . . . . 2
    A. Rule 29 of the Federal Rules of Criminal Procedure - Motion for Judgment of
       Acquittal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    B. Rule 33 of the Federal Rules of Criminal Procedure - New Trial . . . . . . . . . . . . . . . 2

IV. Superseding Indictment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    A. General Allegations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    B. Count 1: Charging Investment Adviser Fraud (15 U.S.C. § 80b-6) . . . . . . . . . . . . . 8
    C. Count 2: Conspiracy to Commit or Attempt Mail and Wire Fraud
       (18 U.S.C. §§ 1341 & 1343; 18 U.S.C. § 1349) . . . . . . . . . . . . . . . . . . . . . . . 10
    D. Counts 3 and 4: Mail Fraud/Aiding and Abetting (18 U.S.C. §§ 1341 and 2) . . . . . 11
    E. Counts 2, 3 and 4 allege a violation of 18 U.S.C. §§ 1341, 1343, 1349 and 2. . . . . . 11

V. A Summary of the Testimony of Three Major Witnesses
    for the Government, i.e., T.C. Gasper, James McLean and Jeremy Durgin . . . . . . . . . 12
    A. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    B. A Summary of the Testimony of T.C. Gasper and James McLean . . . . . . . . . . . . . 13
    C. Summary of the Testimony of FBI Agent Jeremy Durgin . . . . . . . . . . . . . . . . . . . . 25

VI. Defendant's Rule 29 Motion for Acquittal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

VII. Defendant's Rule 33 Motion for New Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
    1.  Failure to instruct the jury as a matter of law concerning
        the client investor and fiduciary duty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
        a. The defendant's first preserved objection with respect to
           instructions regarding client investor and fiduciary duty . . . . . . . . . . . 34
        b. The defendant's second preserved objection with respect to
           instructions regarding client investor and fiduciary duty. . . . . . . . . . . . 36
        c. The defendant's third preserved objection with respect to
           instructions regarding client investor and fiduciary duty. . . . . . . . . . . . 37
        d. The defendant's fourth preserved objection with respect to
           instructions regarding client investor and fiduciary duty . . . . . . . . . . . 39
    2.  Refusal of the Court to allow impeachment of Messrs. Gasper and McLean
        concerning unlawful and negligent actions of the OBWC . . . . . . . . . . . . . . . . 41
    3.  Refusal to allow use of documents related to Mr. McLean's appeal
        to the State Personnel Board of Review to impeach him . . . . . . . . . . . . . . . . . 42

(1:07 CR 339)

|     | 4.  | Permitting the government to constantly refer to the OBWC as a victim and to its role in helping injured workers, but preventing defendant from referring to the OBWC's unlawful actions, such as investing in hedge funds and crimes by its employees | 42 |

4.   Permitting the government to constantly refer to the OBWC
     as a victim and to its role in helping injured workers, but preventing
     defendant from referring to the OBWC's unlawful actions, such as
     investing in hedge funds and crimes by its employees . . . . . . . . . . . . . . . . . . . 42

5.   Refusal to admit minutes of the August 14, 2004 meeting of the
     OBWC oversight committee where Mr. McLean stated the OBWC
     had no hedge fund investments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

6.   Refusal to admit the 2004 version of the OBWC investment policies and
     guidelines authorizing hedge fund investments for the first time . . . . . . . . . . . 43

7.   Upon reading Mark Lay's civil deposition testimony to the jury
     after deliberations began, refusal to give limiting instructions required
     by *United States v. Marwin Smith,* 419 F.3d 521 (6th Cir. 2005)
     cautioning the jury not to place too much emphasis on the testimony
     or take it out of context . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

8.   Failure to rule on objections in Mark Lay's deposition prior to
     reading it to the jury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

9.   Failure to advise the jury as a matter of law that the PPM guidelines
     were revised on May 18, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

9a.  The defendant's cumulative error claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

VIII. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

ii

(1:07 CR 339)

## APPENDICES

| Description | Appendix  No. |
|---|---|
| Superseding Indictment | 1 |
| Government's Exhibit 3011 | 2 |
| Court's Jury Instructions 13 - 26 | 3 |
| Defendant's Proposed Jury Instructions (Docket No. 94) | 4 |
| Trial Witness Log* | 5 |

*Note:  The Court has attached as Appendix 5 the Trial Witness Log to assist appellate review. The jury was impaneled on October 12, 2007.  Trial testimony began on October 15, 2007.  The jury returned its guilty verdicts on October 30, 2007.  Prior to the return of the jury verdict, transcripts of the testimony of Terrence Gasper and James McLean were filed on October 25, 2007.  See Dockets 100, 101 and 102.  As a consequence, there is no single transcript of testimony of the many witnesses in this case.  As it developed, testimony of witnesses was filed by several court reporters, but not in sequence with respect to the testimony.

(1:07 CR 339)

## I.  Introduction

The defendant, convicted of the four counts in the superseding indictment, has filed a motion pursuant to Rule 29 of the Criminal Rules of Procedure seeking an acquittal, or in the alternative, a new trial.  The defendant awaits sentencing now scheduled for May 27, 2008.

## II.  A Time Line of Events in this Case

The indictment was returned against the defendant on June 14, 2007, setting forth four counts.  The defendant was eventually arraigned on July 2, 2007, entered pleas of not guilty and trial was scheduled for September 4, 2007.

On September 7, 2007, a superseding indictment was filed, again setting forth four counts.[1]  The earlier trial date of September 4, 2007, was vacated.

Earlier, on July 30, 2007, the defendant filed a motion to dismiss (Docket No. 31) and then filed an amended motion to dismiss on July 31, 2007 (Docket No. 32).  The government filed its response in opposition on August 13, 2007 (Docket No. 40).  The Court entertained oral argument on the defendant's motion to dismiss.  A transcript of the argument regarding the motion to dismiss was subsequently filed on September 10, 2007.  (Docket No. 56).  The Court filed its memorandum opinion denying the amended motion to dismiss on September 27, 2007. (Docket No. 68).

The trial began on October 12, 2007, with the selection of a jury.  The trial commenced on October 15, 2007, and concluded with guilty verdicts returned by the jury on October 30, 2007.  In addition, the jury returned a verdict regarding the issue of forfeiture, finding that the

---

[1]Appendix No. 1.

1

(1:07 CR 339)

proceeds obtained and subject to forfeiture constituted the sum of $590,526.23.

### III.  Applicable Law - Standard of Review for Rule 29 and Rule 33 Motions

A.    Rule 29 of the Federal Rules of Criminal
      Procedure - Motion for Judgment of Acquittal

A motion for judgment of acquittal should be denied if the Court determines that, "after

viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact

could have found the essential elements of the crime beyond a reasonable doubt."  *United States*

*v. Mackey*, 265 F.3d 457, 460 (6th Cir. 2001)(quoting *Jackson v. Virginia*, 443 U.S. 307, 319

(1979))(emphasis in original).  When viewing the evidence by this standard, the Court may not

make independent determinations regarding witness credibility or the weight that should be

accorded to the evidence.  *United States v. Abdullah*, 162 F.3d 897, 902-903 (6th Cir. 1998)("we

do not weigh the evidence presented, consider the credibility of witnesses, or substitute our

judgment for that of the jury" (citing *United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993)).

Instead, the Court must assume the truth of the evidence offered by the prosecution and give the

government the benefit of all inferences that can be reasonably drawn therefrom.  *United States*

*v. Overmyer*, 867 F.2d 937, 939 (6th Cir. 1989)("the court assumes the truth of the evidence

offered by the prosecution" (quoting *United States v. Martinez*, 763 F.2d 1297, 1312 (11th Cir.

1985)); *United States v.  Abdullah*, at 903 ("[give] the government the benefit of all inferences

that could be reasonably drawn from the testimony" (citing *Jackson v. Virginia* at 319)).

B.    Rule 33 of the Federal Rules of Criminal Procedure - New Trial

Rule 33 provides that "[u]pon defendant's motion, the court may vacate any judgment

and grant a new trial if the interest of justice so requires."  Lay's motion for a new trial is based

2

(1:07 CR 339)

on insufficiency of the evidence and a series of errors that cumulatively warrant a new trial.

Defendant contends the Court that the cumulative effect of nine errors produced a trial that was

fundamentally unfair.

"Errors that might not be so prejudicial as to amount to a deprivation of due process

when considered alone, may cumulatively produce a trial setting that is fundamentally unfair."

*United States v. Ashworth* 836 F.2d 260, 267 (6th Cir. 1988) (quoting *Walker v. Engle*, 703 F.2d

959, 963 (6th Cir. 1983), *cert. denied* 464 U.S. 951, 962 (1983)).  However, when considering the

cumulative effect of errors, the Court must guard against the "magnification" of errors which

were of "little importance in their setting."  *United States v. Ashworth* at 268 (quoting *Glasser v.

United States*, 315 U.S. 60, 83 (1942)).

### IV.  Superseding Indictment

Against the *Jackson v. Virginia* standard test for a evaluating post-conviction motion for

an acquittal, a summary of the superseding indictment is appropriate.  In order to assist the

reader, the footnotes in the summary identify the paragraph reference in the superseding

indictment from which the summary is drawn, as well as evidence presented by the government

at trial in support of those facts and allegations.[2]   The superseding indictment is attached as

Appendix 1 to this Memorandum Opinion.

A.    General Allegations

The OBWC is a state agency which assists employers with expenses related to workplace

---

[2]To further assist the reader, a list of trial witnesses and corresponding document number on the docket wherein the witness testimony is located, is attached as Appendix 5.  References to page numbers of witness testimony refers to the transcript page number.

3

(1:07 CR 339)

injuries by providing medical and compensation benefits. During the time relevant to the superseding indictment, the OBWC's assets averaged $19 billion and were controlled by its Chief Financial Officer.[3]

Lay founded MDL Capital Management ("MDL") in 1992, and served as its Chairman, Co-CEO, principal shareholder, and Chief Investment Strategist.  MDL was registered with the Securities and Exchange Commission ("SEC") as an investment adviser under the Investment Adviser's Act of 1940 ("the Act"), and provided investment adviser services.[4]  SEC registered investment advisers, and their officers and directors, have a fiduciary duty to their clients, which includes acting in good faith in the best interest of the client, making full and fair disclosure of material facts regarding the investment relationship, and employing reasonable care to avoid misleading the client.[5]

In May 1998, the OBWC entered into an Investment Management Agreement with MDL. This agreement retained MDL to manage the OBWC's Long Fund, and established MDL as an investment adviser under the Act.[6]  The OBWC allocated $355 million to the Long Fund for management by MDL, and paid MDL almost $2 million from 1998 to April 2005 in

---

[3]Superseding indictment, ¶ 1-2; Testimony of T.C. Gasper, Docket No. 102, pp. 5 & 13.

[4]Superseding indictment, ¶ 3-5; Testimony of T.C. Gasper, Docket No. 102, p. 61; Testimony of Scott Fisher, Docket No. 127, p. 252; Testimony of Sophia M. Smith (Court Reporter), regarding transcript of Mark Lay's deposition, Docket No. 120, p. 159.

[5]Superseding indictment, ¶ 7-8; Testimony of Lee Fensterstock, Docket No.143, p. 377.

[6]Superseding indictment, ¶ 9-10; Testimony of T.C. Gasper, Docket No. 102, pp. 18-25.

4

(1:07 CR 339)

management fees for the Long Fund.[7]

In May 2002, Lay founded the MDL Active Duration Fund ("ADF") in Bermuda, which consisted primarily of government, corporate, and mortgage-backed securities.  Lay and MDL's president were members of the ADF Board of Directors, and MDL was retained by the ADF board to serve as investment adviser to the ADF by an Investment Advisory Agreement.   The terms and conditions of the ADF investment vehicle were outlined in a Private Placement Memorandum ("PPM").  The PPM contained a variety of information, including Lay's employment credentials, various statements regarding the use of leverage of the ADF's assets, and required investor clients payments to MDL for management of the ADF.   The PPM was provided to potential investors in the ADF, including the OBWC.[8]

The employment credentials provided in the PPM for Lay - who was identified as one with primary responsibility for ADF investment decisions - were false, and concealed from the OBWC some of Lay's prior employers and the reason for his separation from those employers.[9] With respect to the use of leverage, the PPM provided that "up to 150% of the Fund's assets, at the time of investment, may be leveraged . . . ."  This leverage limitation applied to all ADF

---

[7]Superseding indictment, ¶ 13-14; Testimony of T.C. Gasper, Docket No. 102, p. 49; Testimony of Robert Lang, Docket No. 127, pp. 169-170 (Exhibit 8003-2).

[8]Superseding indictment, ¶ 15-21. There are multiple versions of the PPM. The indictment alleges that the version of the PPM provided to the OBWC was dated January 15, 2003.  See superseding indictment, ¶ 22. Exhibit 281-3 *et seq.* (testified to by Robert Lang) and Exhibit 6-1 *et seq.* (testified to by T.C. Gasper) are identical and is the version of the PPM that was provided to the OBWC.  See also Testimony of Sophia M. Smith (Court Reporter), regarding transcript of Mark Lay, Docket No. 120, p. 153-154.

[9]Superseding indictment, ¶ 21.  The defendant challenged the admission of evidence related to prior conduct of the defendant.  The Court oversaw the deposition of Steven Peras regarding this issue.  The Court ultimately concluded that the government could not use this evidence in its case-in-chief.  The defendant did not testify, therefore, this evidence was never introduced at trial.

5

(1:07 CR 339)

assets, including United States Treasury Securities.[10]  The OBWC paid MDL almost $1.8 million in fees for its services related to the OBWC's investment in the ADF.  This fee was paid in addition to the fee the OBWC paid MDL for its services related to the Long Fund.[11]

Lay, with encouragement from T.C. Gasper, successfully solicited the OBWC to invest in the ADF.  In September 2003, the OBWC electronically transferred $100 million from the Long Fund to the ADF.  During the time period relevant to the superseding indictment, the OBWC was the sole investor in the ADF.[12]

Lay directed the trading activity of the ADF during the period of time of OBWC's investment.  He did so through the use of brokerage services both inside and outside the State of Ohio, and utilized the telephone, e-mail and mail services to carry out these transactions. Contrary to the guideline terms of the PPM, Lay leveraged the ADF's assets - which consisted solely of OBWC funds - far in excess of the 150% leverage limitation contained in the PPM. Lay, MDL, and others provided reports to the OBWC regarding the ADF, but none of the reports reflected the amount of leverage exercised in the ADF.  Lay's excess leverage of ADF assets violated his fiduciary role as an investment adviser to act in the best interest of his client, the OBWC.[13]

---

[10]Superseding indictment, ¶ 22; Exhibit 281-24.

[11]Superseding indictment, ¶ 21; Testimony of Robert Lang, Docket No. 127, pp. 170-171; Exhibits 8003-1 and 8003-3.

[12]Superseding indictment, ¶ 22-24; Testimony of T.C. Gasper, Docket No. 102, pp. 39, 42-44, 49; Testimony of Brian Sommers, Docket No. 120, p. 216 (Exhibit 10-10).

[13]Superseding indictment, ¶ 25-31.  Testimony of T.C. Gasper, Docket No. 102, pp. 30-31, 61, 85-86; Testimony of Jeremy Durgin, Docket No. 119, pp.  21, 23, 50; Testimony of James McLean, Docket No. 100, pp. 16-27 (Exhibits 2008-2016); Testimony of Robert Lang, Docket No. 127, pp. 179-180, 198.

(1:07 CR 339)

      The OBWC met with Lay in mid-April 2004 because it was concerned about a $7 million decline in the value of the ADF.  At that meeting, Lay did not tell the OBWC that the ADF was leveraged well beyond the 150% limitation in the PPM, and concealed from the OBWC the ADF's actual losses, which were $32 million.[14]  The OBWC learned for the first time in May 2004 that the ADF had lost $32 million when it received the April 2004 report.  During the Spring of 2004, Lay concealed and misrepresented to the OBWC the true nature of the leverage being exercised in the ADF, and did not reveal to the OBWC that the ADF's losses were caused or magnified because he routinely exceeded the 150% leverage limit.[15] Despite the ADF's losses, and because of Lay's failure to disclose the extent of leverage he exercised with ADF investments, the OBWC transferred another $100 million from the Long Fund to the ADF in May 2004.[16]

      After confronting Lay in May 2004 about the excessive leverage being utilized in the ADF, the ADF Board of Directors decided to amend the PPM's guidelines to sanction leverage in excess of 150%, but only for United States Treasury Securities; to notify the OBWC of the excess leverage that had already been used; and to seek the OBWC's approval for continued use of leverage in excess of 150%.  In August 2004, the ADF Board sent a letter to the OBWC purporting to notify the OBWC of Lay's past and intended use of leverage in excess of 150% and to secure its approval.  However, the OBWC refused to permit excess leverage and refused

---

[14]Superseding indictment, ¶ 32-33.  Testimony of James McLean, Docket No. 100, pp. 37-49.

[15]Superseding indictment, ¶ 35.  Testimony of James McLean, Docket No. 100, pp. 46-47, 82-84, 131-132; Testimony of Jeremy Durgin, Docket No. 119, pp. 23 & 29.

[16]Superseding indictment, ¶ 36.  Testimony of T.C. Gasper, Docket No. 102, pp. 78, 86-87.

(1:07 CR 339)

to agree to the changes in the PPM.[17]

In mid-September 2004, the OBWC confronted Lay about the poor performance of the ADF.  At that meeting, Lay admitted over-leveraging but falsely told the OBWC he had leveraged the ADF's assets approximately 900%, when he knew or should have known the ADF leverage exceeded 4,500%.[18]

By the time the OBWC learned that the ADF's losses were largely due to Lay's exercise of leverage in violation of the PPM, most of its $200 million investment in the ADF was lost.  In an effort to avoid the total loss of its investment, the OBWC invested an additional $25 million in the ADF on September 23, 2004.  But shortly thereafter, the OBWC formally requested a redemption of its investment in the ADF.[19]  In October 2004, Lay attempted to obtain further investments from the OBWC in the ADF, but the OBWC refused.  As a result of Lay's fraud and deceit upon the OBWC regarding leverage of the ADF well in excess of 150%, the OBWC recovered only $9 million from its $225 million investment.[20]

B.      Count 1: Charging Investment Adviser Fraud (15 U.S.C. § 80b-6)

Sections 80b-6(1), (2) and (4) provide that:

> *It shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly--*

---

[17]Superseding indictment, ¶ 37-39.  Testimony of James McLean, Docket No. 100, pp. 82-86; Testimony of T.C. Gasper, Docket No. 102, p. 75.

[18]Superseding indictment, ¶ 40.  Testimony of T.C. Gasper, Docket No. 102, pp. 79-80.

[19]Superseding indictment, ¶ 41-43.  Testimony of  T.C. Gasper, Docket No. 102, pp. 91-98; Testimony of James McLean, Docket No. 100, p. 101.

[20]Superseding indictment, ¶ 45.  Testimony of James McLean, Docket No. 100, pp. 134-135.

8

(1:07 CR 339)

>*(1) to employ any device, scheme, or artifice to defraud any client or prospective client;*
>
>*(2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client;*
>
>*. . . .*
>
>*(4) to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative. The Commission shall, for the purposes of this paragraph (4) by rules and regulations define, and prescribe means reasonably designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative.*

Count 1 of the superseding indictment alleges that, as an investment adviser registered with the SEC, MDL and its officers and employees - including Lay - owed a fiduciary obligation to its client, the OBWC.  This fiduciary obligation included acting in good faith and in the best interest of the OBWC, fully and fairly disclosing all material facts regarding the investment relationship between MDL and the OBWC, and employing reasonable care to avoid misleading the OBWC.[21]

From September 2003 through January 2005, Lay and others used the mails, wires and other means of interstate and foreign commerce to engage in a various schemes, transactions and acts to defraud, deceive and manipulate the OBWC, and thereby the ADF, by exercising leverage in excess of 150% in violation of the PPM, and concealing and failing to disclose the full extent of his exercise of leverage in excess of 150%.[22]

---

[21]Superseding indictment, count 1, ¶ 2.

[22]Superseding indictment, count 1, ¶ 3.

(1:07 CR 339)

    C.      Count 2: Conspiracy to Commit or Attempt Mail and
                    Wire Fraud (18 U.S.C. §§ 1341 & 1343; 18 U.S.C. § 1349)

From September 2003 through January 2005, Lay knowingly and willfully conspired with others to defraud, deceive, and manipulate the OBWC regarding a material matter, and to obtain money and property by false and fraudulent means utilizing the postal service, commercial interstate carrier, and transmission by wire for the purpose defrauding, deceiving and manipulating the OBWC regarding the ADF, including the amount of leverage exercised, the impact of leverage on the ADF's value, and the management team and administration of the ADF.

In furtherance of the scheme to defraud, Lay: 1) caused false employment credentials to be included in the PPM which falsely stated his employment history in an effort to conceal certain past employers and his reasons for separation from these employers from the OBWC and others who relied on the PPM;[23] 2) caused documents and information which resulted in execution of investment transactions which caused leverage of the ADF to exceed 150% to be delivered and transmitted interstate; 3) concealed the true nature and effect of leverage of the ADF in excess of 150% by failing to disclose the use of excess leverage and its effect on the OBWC's investment in the ADF; and 4) made false statements to others regarding the OBWC's knowledge of and consent to the use of excessive leveraging and regarding the OBWC's commitment to make additional investments in the ADF.

In addition, Lay and others caused various trade confirmation statements to be mailed

---

[23]As previously indicated, the Court declined the government's attempt to offer testimony to the effect that the PPM falsely stated Lay's employment history in an effort to conceal certain past employers and his reasons for separation from those employers from the OBWC and others who relied on the PPM.

(1:07 CR 339)

and delivered by commercial interstate carrier, and caused various communications to be

transmitted by wire in interstate and foreign commerce in order to execute or attempt to execute

the scheme to defraud, deceive, and manipulate the OBWC.

    D.    <u>Counts 3 and 4: Mail Fraud/Aiding</u>
             <u>and Abetting (18 U.S.C. §§ 1341 and 2)</u>

From September 2003 through January 2005, Lay, having devised a scheme to defraud

the OBWC as to a material matter and to obtain money and property by false and fraudulent

circumstances, used the postal service and commercial interstate carrier to mail and deliver

certain trade confirmations related to the ADF.

    E.    <u>Counts 2, 3 and 4 allege a violation of</u>
             <u>18 U.S.C. §§ 1341, 1343, 1349 and 2</u>

       § 1341. Frauds and swindles

> *Whoever, having devised or intending to devise any scheme or*
> *artifice to defraud, or for obtaining money or property by means of*
> *false or fraudulent pretenses, representations, or promises, or to*
> *sell, dispose of, loan, exchange, alter, give away, distribute,*
> *supply, or furnish or procure for unlawful use any counterfeit or*
> *spurious coin, obligation, security, or other article, or anything*
> *represented to be or intimated or held out to be such counterfeit or*
> *spurious article, for the purpose of executing such scheme or*
> *artifice or attempting so to do, places in any post office or*
> *authorized depository for mail matter, any matter or thing*
> *whatever to be sent or delivered by the Postal Service, or deposits*
> *or causes to be deposited any matter or thing whatever to be sent*
> *or delivered by any private or commercial interstate carrier, or*
> *takes or receives therefrom, any such matter or thing, or*
> *knowingly causes to be delivered by mail or such carrier*
> *according to the direction thereon, or at the place at which it is*
> *directed to be delivered by the person to whom it is addressed, any*
> *such matter or thing, shall be fined under this title or imprisoned*
> *not more than 20 years, or both. If the violation affects a financial*
> *institution, such person shall be fined not more than $1,000,000 or*

(1:07 CR 339)

*imprisoned not more than 30 years, or both.*

§ 1343. Fraud by wire, radio, or television

*Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.*

§ 1349. Attempt and conspiracy

*Any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.*

§ 2. Principals

*(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.  (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.*

### V.  A Summary of the Testimony of Three Major Witnesses
### for the Government, i.e., T.C. Gasper, James McLean and Jeremy Durgin

A.    Introduction

At this point in the analysis, the Court is of the view that a summary of the government's three major witnesses with respect to the factual background and the OBWC's relationship with defendant and the investment in the ADF will further assist the reader in understanding the evidence presented by the government in support of the allegations in the superseding

12

(1:07 CR 339)

indictment.

      The essence of the prosecution's case, in support of the charge contained in count 1 of the superseding indictment, was to the effect that following the initial 1998 placement of $335 million with the defendant for investment in the Long Fund, a subsequent agreement between the defendant Mark Lay and T.C. Gasper, the chief financial officer of the OBWC, eventually led to the movement of $200 million from the Long Fund to the ADF (Active Duration Fund), a modified hedge fund in which leveraging of the funds of the OBWC in the Active Duration Fund would be limited to 150%.   The government's case then proceeded to demonstrate, contrary to the 150% limitation on leveraging, that the use of leveraging in the ADF, far in excess of 150%, eventually led to a loss of over $200 million to the OBWC.  The three primary witnesses in support of the government's case with respect to count 1 included T.C. Gasper, the chief financial officer for the OBWC, James McLean, the chief investment officer for the OBWC and Jeremy Durgin, an FBI agent, who tracked the extensive leveraging.

      B.      A Summary of the Testimony of T.C. Gasper and James McLean

      The OBWC, in its efforts to place its vast sums in income earning securities,[24] began a relationship with the defendant in 1998.[25]  The description of the policy regarding the use of

---

[24]In 1995, OBWC abandoned its internal management of its assets and turned to outside managers to invest OBWC funds.  See testimony of T.C. Gasper, Docket No. 102,  p. 17.

[25]The testimony of T.C. Gasper, Docket No. 102, p. 19, line 18, through p. 21, line 2 follows:

      Q.      Sir, have you had occasion to become aware of a company called MDL
              Capital Management?

      A.      Yes.

      Q.      And do you know whether or not MDL managed the money for the

(1:07 CR 339)

outside money managers by OBWC after the change in policy was summarized by T.C. Gasper

in the following exchange at Docket No. 102, page 34, line 23 through line 24 on page 35:

> Q.    Now, I would like to talk with you just a little bit more
> about managers and how many of them, for instance, did
> the Bureau hire?
>
> A.    Over the course of the nine years that I was at the Bureau,
> we had as many as 150 managers running as I said as much
> as 20 to 22 billion dollars.  Among them, we had a very
> diversified policy at the OBWC.  We had all different kinds

---

Bureau?

A.    Yes, it did.

Q.    And who was the principal of MDL during the time it managed the
money for the bureau?

A.    Mark Lay was the principal.

Q.    What was your understanding of Mr. Lay's role at MDL Capital
Management relative to the money being managed for the Bureau?

A.    When MDL was retained, I believe it was in 1998 as one of the core
bond managers under the minority investment management program at
the OBWC, it was my understanding and the understanding of Mr.
Cowman and other members of the investment department that Mr.
Lay, who was the chief executive officer at MDL, was also far and
away the primary decision maker relative to their strategies and how
they ran their clients' money.  When you were hiring MDL, you were
hiring Mr. Lay.

Q.    When the investment manager hiring decisions were made, were you a
part of those?

A.    I was indirectly involved in the some of the hiring decisions.  By that
time, Mr. Cowman was in charge of the investment department.  We
sent out what we call RFPs at this state level, these request for
proposals, where we indicated what kind of managers we wanted and
anyone can send in essentially an application to become a manager.

It was in that program that MDL submitted an RFP through Mr.
Cowman's office.  MDL was then approved as was the guideline in the
investment policy was approved as a hireable manager by the
investment subcommittee of that Oversight Commission.  [sic]

14

(1:07 CR 339)

> of stocks and bonds being managed.  We had domestic stocks, international stocks, we had private equity participations.  It was about 150 managers.
>
> Part of the reason for the high number was our minority and emerging manager policies.  I mentioned the minority policy before looking at 10 percent of our assets being managed by minorities.
>
> At the time, most minority firms were smaller firms, so in order to give that much of an allocation to them, you had to give it in relatively small pieces.  Our emerging managers were defined by the size of their assets.  Frankly, that was a way for us to try to give some money to female-owned organizations that did not qualify under the state minority laws.
>
> Again, those are also small firms for the most part, so between the two of them, that 150 managers, we probably had 60 or 70 managers that were minority managers or emerging managers, and there were probably 20 or 25 managers that probably controlled 80/85 percent of the Bureau's funds.

The defendant was the founder, chairman and chief investment strategist of MDL Capital Management Inc. which was registered with the United States Securities and Exchange Commission as an investment adviser.[26]  The relationship began when OBWC invested substantial sums of money in the Long Fund managed by the defendant.[27]  OBWC paid significant investment fees to the defendant's company for its work in investing the monies in the Long Fund.[28]

------------------------------------

[26]See Exhibit 1for a copy of the formal investment agreement between MDL and the OBWC.

[27]Initially, all the funds of the OBWC invested with MDL were in the core bond fund, sometimes also referred to as the Long Fund.  Testimony of T.C. Gasper, Docket No. 102, p. 34.

[28]Testimony of Robert Lang, Docket No. 127, p.170; Exhibit 8003-2.

(1:07 CR 339)

In 2002, the OBWC decided to modify its policy to allow investment in financial derivatives in order to hedge assets.  The change was described by T.C. Gasper in the testimony at Docket No. 102, page 41, line 14 through line 5 on page 43:

Q.     Did you have any discussions with Mr. Lay about a potential investment in the Active Duration Fund and the Bureau's policies?

A.     Yes, we did.  And relative to – let's start with the Bureau's policies.  In mid year 2002, the external investment consultants were employed by the Bureau, and these consultants either reported to me or to Mr. Cowman, and they reported jointly to the administrator and to the chairman of that Oversight Commission, and the idea there was so that those two most senior people would have somebody to talk to about investment issues and strategy and policy changes other than their own staff.

It was a checks and balances, you know, type of policy there. Well, in mid 2002, they submitted a report based on the request from the chairman of the Oversight Commission.  They submitted a report to the Bureau to the Oversight Commission in a public meeting that the Bureau started [sic] to consider alternative investments such as hedge funds and financial derivatives and the use of such funds to help control the risk of running the overall state insurance fund.

In the fall of '02, in September, at the Oversight Commission meeting that was held, and the Oversight Commission meetings were monthly and they were public meetings, Mr. Cowman had recommended a change to the investment policy that would, in fact, allow the use of financial derivatives for the first time the use of financial derivatives in order to hedge assets that the state insurance fund held.

That was approved.  It was a one-line addition to the investment policy.  It was approved in September of '02.  Subsequent to that, I had conversation both with Mr. Lay and with a gentleman who was aiding Mr. Lay in marketing his product, a broker dealer in Cleveland, Ohio, and I indicated to both that person and to Mr. Lay that there was the possibility since we had changed the investment policy in September, there was a possibility that we might be able to do something with Mr. Lay or MDL or however

16

(1:07 CR 339)

> that evolved, that we might be able to do something in the way of a
> hedge fund to hedge the bonds that MDL held in their core
> portfolio since our policy now permitted that.

Consequently, an agreement was reached with OBWC and MDL Capital Management

wherein monies were shifted from the Long Fund to the hedge fund.[29]

The premise underlying T.C. Gasper's belief that switching some of the OBWC's funds

from MDL's core portfolio (i.e., the Long Fund) to the hedge fund (the MDL Active Duration

Fund) was advisable was the subject of the following testimony by T.C. Gasper at Docket No.

102, line 12 of page 48 through page 50, line 6.

> Q.    Now, sir, relative to the derivative that's used in this
>        sentence and the terminology held in the portfolio, what
>        was the manager to understand derivatives could be used
>        against which portfolio being managed?
>
> A.    In all the discussion that Mr. Lay, Mr. White and myself
>        and George Forbes, a member of the Oversight
>        Commission had regarding the use of the ADF, our
>        conversations centered on the ADF being used to hedge the
>        bonds that were held in MDL's core portfolio.
>
>        We had discussed that over time we would get to a point
>        where half of the money that ADL [sic] had under its
>        control would be in the core portfolio, half would be in the
>        ADF, so that by using the ADF, if they so desired, MDL
>        could hedge all the bonds that they held in their core
>        portfolio.
>
> Q.    Sir, when you use the term "hedge," what was your
>        understanding of how the active duration fund would be
>        used as a hedge against the core or the long fund?
>
> A.    My understanding was that if Mr. Lay felt that bond prices
>        in general were going to decline since he had to remain

---

[29]The hedge fund was identified as the MDL Active Duration Fund.

17

(1:07 CR 339)

invested in his core portfolio under our policy, that the ADF would be used to hedge those bonds that he held in the core portfolio; so that if the bond market did, in fact, go down in value, we would make some money in the ADF to offset the losses that we would have, the unrealized losses we would have suffered in the actual core portfolio. That was the intent of the discussion at all times subsequent to the change in the Bureau's investment policy.

Q.     And approximately how much money of the Bureau's did MDL have in its core fund at the time you were considering investing in the active duration fund?

A.     At that time, MDL had approximately, I believe, $400 million in their core portfolio. The idea was that we would get the ADF started by our taking 100 million out of the core portfolio and putting it into the ADF.

As I said, we had discussed and my intent was that eventually we would – what we hoped would be an appropriate time in the market, put another 100 million out of the core into the ADF so that we would have 200 million in each fund.

Q.     Now sir, at any time when you were making decisions about authorizing money to be invested into the active duration fund, did you use any source of funds other than that already under the management of MDL?

A.     No.

The government established that the OBWC lost over $200 million of its monies transferred from the Long Fund or core fund to the hedge fund (the MDL Active Duration Fund) and the losses resulted from excessive leveraging of the OBWC funds transferred from the Long Fund to the Active Duration Fund. Again, T.C. Gasper explained the term leverage in the following testimony and his understanding that the leveraging would be limited to 150%.[30]

---

[30]Testimony of T.C. Gasper, Docket No. 102, p. 50, line 7 through line 14, page 53.

18

(1:07 CR 339)

Q.    Now, the term "leverage" has come up.  Do you know what that is, sir?

A.    Yes.

Q.    Can you briefly explain what leverage is?

A.    Leverage is essentially taking a market position that reflects a value far in excess of assets that you actually hold.  You take that market position, you leverage that position by borrowing money.  It's no different from a home equity loan on your house.

A lender in the case of a hedge fund, it's typically an investment banker or broker, lends a manager money against the value of the hedge fund that they have and allows that manager to then control market positions way beyond the money that they actually have in the fund.

It would be like, you know, going out and saying, I want to buy a house.  I make $50,000 a year.  You know, I probably ought to buy something for 100,000 or something of that nature, and say, well, I will see if I could borrow a couple million because I think that the markets are coming my way or I got a windfall coming.

Typically where you run into trouble is where the value of your collateral since nobody lends money that I am aware of without collateral, when the value of that collateral declines, if it does, for example, in the price of your home going down and that's less value for the bank that has your equity line or in the case of a market position, if the market goes against you, what happens is your lender will come back and say you need to put more cash in there.  We need more value to support this leveraging.

Q.    Now sir, did you have any discussion with Mr. Lay about how or whether leverage would be used in the active duration fund before you invested?

A.    Yes, we did.

19

(1:07 CR 339)

Q.  Please tell us about those discussions.

A.  Mr. Lay and I, Mr. Wright and I and Mr. Forbes and I all had discussions during the first half of 2003 reflecting that all we wanted to do was to help the fund get going with our initial investment and use our initial investment and the subsequent investment that I was planning on.

Remember I wanted to dump half our money into the ADF to hedge the bonds that Mr. Lay, that MDL held in their core portfolio.  That was the only way we could approach utilizing the ADF because of what the wording in the policy change had been.

You can only use financial derivatives to hedge assets that you have in your portfolio.  So that was the basis of the initial and all conversations that we had in 2003 prior to my signing the agreement in August of '03.  This wasn't a secret among those of us who were discussing it.  This was the plan.  Hedge what we have, eventually put more monies into the hedge fund and so that we could hedge exactly what we had.

Eventually, we put 100 million in ADF and 300 million in the core fund, so technically, we could only [sic] 100 million of what was in the core fund.  I wanted to get to the point where he could hedge his entire position if in the short run if he thought that would be profitable for the fund.

Q.  Was there any expectation on your part, sir, that Mr. – the active duration hedge fund managed by Mr. Lay would hedge assets outside of those managed by MDL?

A.  No.

Q.  Sir, did you and Mr. Lay have specific discussions about the amount of leverage that would be used in the active duration account?

A.  Yes.  When Mark and I spoke in the first half of '03, and I indicated how we would have to approach it, Mark told me

20

(1:07 CR 339)

> that the fund would be set up, that we would be using leverage only to reflect the value of what he had in the fund, and then when I got the offering memorandum that he sent to me describing the leverage that would be used in the fund, it put in there as the guideline that the leverage would not exceed 150 percent or one and a half times the value of what was in the fund which was exactly what Mr. Lay and I had discussed.  (Emphasis added)
>
> The fact that there was that extra half in there, the one and a half, I viewed that as a way to give him some flexibility in running money and moving monies around and the dollar amount of that extra 50 percent of value would not have been a material amount relative to the size of the overall bond portfolio at the Bureau.

Terrence Gasper gave extensive testimony during the trial of the defendant and indicated that the defendant had agreed to not engage in leveraging beyond 150% of the hedge fund's value.  As a consequence, $100 million was initially transferred in September of 2003 from the Long Fund to the new fund described as the ADF Fund, i.e., the hedge fund.[31]  A second $100 million was transferred from the Long Fund to the ADF Fund in May of 2004.[32]  All of the funds in the ADF (Active Duration Fund) were transferred from the Long Fund to the ADF.

James McLean was hired by the OBWC as its chief investment officer in August of 2003.  His primary responsibility included overseeing the $17 billion investment portfolio which included reviewing the performance of individual investment managers.  As a consequence, he had the responsibility to review the performance of the defendant Mark Lay.  By the time his duties began, including reviewing the performance of Mark Lay, the decision by T.C. Gasper to

---

[31]Testimony of T.C. Gasper, Docket No. 102, p. 68, lines 14-25.

[32]Testimony of T.C. Gasper, Docket No. 102, p. 69, line 12; p. 70, line 7.

(1:07 CR 339)

permit the movement of monies from the Long Fund under the control of Mark Lay to the ADF

Active Duration Fund had been made.  For some months, McLean had the opportunity to review

reports from Mark Lay which incorporated the activity of the Long Fund and also the Active

Duration Fund.[33]  The reports involving the Active Duration Fund were limited to one page and

devoid of any reporting with respect to how the monies were being invested.  The initial reports

demonstrated that the asset value of the ADF remained close to the initial investment of $100

million.[34]

Beginning in early 2004, the defendant began exercising leverage in excess of 150%

without disclosure to or the consent of the OBWC, which was the sole investor in the ADF.  By

April of 2004, the OBWC continued to receive reports that summarized the status of the ADF in

one line, and demonstrated an unexplained $7 million loss in the ADF's value.[35]  Subsequently,

Jim McLean, the chief investment officer of the OBWC, discussed the loss with the defendant in

a meeting in which the defendant neither stated nor admitted that he had exercised leverage well

in excess of the 150% limitation as understood by the OBWC.[36]

By May of 2004, the board of directors of the ADF confronted the defendant about the

losses and the leveraging beyond the 150% ceiling.  Testimony at trial indicated that the

defendant initially denied the excessive leveraging, but then told the ADF board members that

---

[33]Testimony of James McLean, Docket No. 100, pp. 17-27.

[34]Testimony of Jeremy Durgin, Docket No. 119, pp. 63-64; Exhibit 3024.

[35]Testimony of James McLean, Docket No. 100, p. 37, lines 9-22.

[36]Testimony of James McLean, Docket No. 100, pp. 35-46.

22

(1:07 CR 339)

the OBWC was aware of the over-leveraging and had approved of the over-leveraging.[37]

      Against that background, the ADF board of directors decided to revise the language of the PPM to remove the leverage limitation from trade involving the Untied States Treasury securities, to notify the OBWC that the defendant had exercised leverage in excess of 150% and to seek the approval of the OBWC of Lay's continued exercise of leverage in excess of 150%, and to seek ratification of his past leveraging practices.

      Following the May 18, 2004 meeting of the ADF board of directors, on August 11, 2004, the ADF board issued a letter to the OBWC entitled "Recent Changes to MDL Active Duration Fund, LTD."  The OBWC refused to approve the changes requested by the ADF board and so notified the ADF board.[38]

      As time passed in the year 2004, the losses in the ADF increased, but the reports received by the OBWC continued to fail to identify the nature of the losses.  During 2004, the ADF incurred huge losses, but the reporting to the OBWC was conducted in such a way that the OBWC had difficulty in determining the extent of its losses.  By September 16, 2004, Terry Gasper and Jim McLean confronted the defendant because of concerns over ADF losses, lack of transparency, and over-leveraging.[39]  During the meeting of September 16, the defendant finally admitted having over-leveraged the ADF, but indicated that the over-leveraging was only

---

[37]Testimony of Robert Lang, Docket No. 126, p. 99; Exhibit 1104-1 through 1104-6.

[38]Testimony of James McLean, Docket No. 100, pp. 85-89.

[39]Testimony of T.C. Gasper, Docket No. 102, pp. 79-89; Testimony of James McLean, Docket No.100, pp. 80-86.

(1:07 CR 339)

approximately 400% to 600% of the ADF assets,[40] when in reality, as it later developed, the over-leveraging was almost 4,000%.[41] By that time, $200 million had been transferred from the Long Fund to the hedge fund.

By the time of the September 16 meeting, a proposed and revised PPM had been submitted to the OBWC eliminating the 150% limit on leveraging. Lay expressed the belief that the OBWC had approved the proposed and revised PPM, and when told that the OBWC would not approve the proposed and revised PPM, Lay responded, according to McLean, "I guess I am in trouble now."[42]

In sum, McLean's testimony supported the proposition that a single report was being received from Lay describing the condition of both the Long Fund and the ADF with minimal information about the nature of the investments in the ADF and with an absence of any indication that Lay was involved in excessive leveraging which led to the demise of OBWC's investment.

Later in September of 2004, the defendant advised the OBWC that if it did not invest an additional $25 million immediately, the entire fund would collapse. Against that background, the OBWC invested another $25 million, bringing the total investment to $225 million.[43] One week later, the OBWC formally requested a redemption of its investment in the hedge fund, requesting that the remaining balance be liquidated and distributed to the OBWC by the end of

---

[40]Testimony of T.C. Gasper, Docket No. 102, p. 80.

[41]Testimony of Jeremy Durgin, Docket No. 119, pp. 58-89; Exhibit 3021.

[42]Testimony of James McLean, Docket No. 100, p. 96.

[43]Testimony of James McLean, Docket No. 100, p. 100, line 8 to p. 101, line 14.

(1:07 CR 339)

2004.[44]

As of November, 2004, the OBWC had recovered approximately $9 million of its $225 million of its investment in the hedge fund.

C.    Summary of the Testimony of FBI Agent Jeremy Durgin

FBI Special Agent Jeremy Durgin tracked the trading activity of the funds in the ADF and presented multiple exhibits supporting his determination that Mark Lay had engaged in excessive leveraging ultimately resulting in a loss of over $214 million dollars.  He attributed slightly over $2 million in loses to leveraging within the 150% limit and loses in excess of $212 million attributable to leveraging in excess of 150%.[45]

Durgin explained that the defendant, Mark Lay, used two levels of leveraging.  One is called "short selling" and the other is called "going long".  He primarily engaged in short selling, but in the long run, it did not matter whether Mark Lay sold short or went long.  Both created debt.[46]  In support of the scope and extent of the leveraging, the government presented a series of exhibits prepared by Durgin.  Of particular relevance is government's Exhibit 3011 attached hereto as Appendix 2  demonstrating over the life of the ADF, leverage in excess of 150% grouped by trading days.  Durgin testified that over the life of the ADF, only 37.9% of the trades were within the 150% limit.[47]  The remaining 62.1% of the trades were over the 150% limit.[48]

---

[44]Testimony of James McLean, Docket No. 100, p. 105, line 8 to p. 110, line 5.

[45]Testimony of Jeremy Durgin, Docket No. 119, pp. 22-23; Exhibit 3015.

[46]Testimony of Jeremy Durgin, Docket No. 119, pp. 28-29.

[47]Id. at pp. 48-50

[48]Id.

25

(1:07 CR 339)

Some of the trades were between the range of 2,001 to 4,000%.[49]  3.8% of the trades, according to Durgin, were between 8,001 and 10,000%.  Finally, according to Durgin, Lay exercised leverage in excess of 10,000% on 3.4% of the trade dates.[50]

## VI.  Defendant's Rule 29 Motion for Acquittal

Lay argues in his motion for acquittal that there was insufficient evidence at trial to find that the government had proved the elements of the offenses charged beyond a reasonable doubt, and therefore the evidence cannot sustain a conviction.[51]

Counsel for the defendant repeatedly argued that it was a question of law for the Court to determine as to whether the OBWC was Lay's client with respect to ADF and that the Court should rule as a matter of law that the OBWC was not Lay's client.  Secondly, counsel for the defendant argued that is was a question of law as to whether the defendant owed a fiduciary duty to the OBWC with respect to the ADF fund, and in that context, the Court should rule as a matter of law that the defendant did not owe a fiduciary duty to the OBWC as to the ADF fund.  The Court interprets the above dual claims to constitute an argument that the evidence, viewed in the light most favorable to the government, was insufficient as a matter of law to support the defendant's conviction under count 1.[52]

---

[49]Id.

[50]Id.

[51]At the close of the government's case, the Court denied Lay's Rule 29 motion for dismissal. Trial Transcript, Docket No. 120, October 24, 2007, pp. 176-183.  Defendant renewed his motion at the close of defendant's case, which was also denied.

[52]The Court's instructions with respect to the elements as to count 1, which touched on the issue of both the client and fiduciary relationship are covered by Jury Instructions 13 - 26.  See Appendix 3.

26

(1:07 CR 339)

Court's Ruling:[53]

Count 1 of the superseding indictment alleges Investment Adviser Fraud in violation of 15 U.S.C. §§ 80b-6(1), (2) or (4). Sections 80b-6(1) and (2) provide that it is unlawful for an investment adviser to defraud a client or prospective client. Section 80b-6(4) provides that it is unlawful for an investment adviser to engage in "any act, practice or course of business which is fraudulent, deceptive, or manipulative," but does not depend on a client relationship.

Lay argues, as earlier indicated, that the OBWC was not his client and he owed no fiduciary duty to the OBWC in connection with its investment in the ADF, and that the Court should have determined as a matter of law that there was insufficient evidence of a client/fiduciary relationship between the OBWC and Lay with respect to OBWC's ADF investments.[54] In support of his argument, Lay cites *Goldstein v. SEC*, 451 F.3d 873 (D.C. Cir. 2006)[55] and the OBWC's execution of the ADF subscription agreement which, along with the PPM, provided that Lay was the investment adviser to the ADF.

In *Goldstein*, the SEC enacted a new rule that counted hedge fund investors as clients (in

---

[53]Defendant also raises this issue in connection with his motion for a new trial, which is discussed *infra*.

[54]Lay has consistently argued throughout this case that his client was the ADF hedge fund, and not the OBWC investor, and cited *Goldstein v. SEC* in support. In Lay's deposition for the civil case related to his role with respect to OBWC's investments in the ADF, the transcript reflects that he repeatedly testified that the OBWC - not the ADF hedge fund - was his client. Testimony of Sophia M. Smith (Court Reporter), regarding transcript of Mark Lay's deposition, Docket No. 120, pp. 153-158.

[55]Related to Lay's argument that the Court should have instructed the jury as a matter of law that the OBWC was not his client with respect to ADF investments, Lay points to the SEC's new anti-fraud Rule 206(4)-8, which was enacted to clarify the SEC's ability to bring enforcement actions against investment advisers who defraud investors of hedge funds after *Goldstein*. In enacting the new rule, the SEC noted that the *Goldstein* court "distinguished sections 206(1) and (2) from 206(4) of the Advisers Act, which is not limited to conduct aimed at clients or prospective clients of investment advisers." Docket No. 147-2, p. 3. The government has alleged in count 1 that Lay violated Section 80b-6(4), which prohibits fraud by an investment adviser regardless of whether there is a client or prospective client relationship.

(1:07 CR 339)

addition to the fund itself) in an effort to require registration by hedge fund investment advisers who may have previously been exempt from registration because they had fewer than fifteen clients.  The *Goldstein* court addressed the scope of investment advisers' exemption from registration in § 203(b)(3) of the Advisers Act and the meaning of "client" as used in that section.  The Court of Appeals' opinion contains a lengthy analysis of the meaning of "client" and characteristics of investment adviser relationships that mark a client relationship.

Noting that the Act does not contain a definition of "client," the *Goldstein* court discusses the Act's definition of investment adviser as any person who, for compensation, engages in the business of advising others regarding investments

> "'either *directly* or through publications or writings' 15 U.S.C. § 80b-2(11)(emphasis added). . .  An investor in a private fund may benefit from the adviser's advice (or he may suffer from it) but he does not receive the advice *directly*.  He invests a portion of his assets in the fund. . . . Having bought into the fund, the investor fades into the background; his role is completely passive."

*Goldstein* at 879-880 (emphasis in original).

The *Goldstein* court noted that prior to the SEC's new rule attempting to count hedge fund investors as clients for the purpose of determining investor adviser registration requirements, the SEC explained that:

> "a 'client of an investment adviser typically is provided with individualized advice that is based on the client's financial situation and investment objectives.  In contrast, the investment adviser of an investment company need not consider the individual needs of the company's shareholders when making investment decisions, and thus has no obligation to ensure that each security purchased for the company's portfolio is an appropriate investment for each shareholder.'"

28

(1:07 CR 339)

*Goldstein* at 880 (quoting Status of Investment Advisor Programs Under the Investment Company Act of 1940, 62 Fed.Reg. 15,098, 15, 012 (March 31, 1997)).

      Noting that the United States Supreme Court in *Lowe v. SEC*, 472 U.S. 181, 105 S.Ct. 2557 (1985) was construing an exception to the definition of "investment adviser" and not the meaning of "client," the *Goldstein* court pointed out that the Supreme Court in *Lowe*

> "embraced a similar conception of the adviser-client relationship when it held . . . that publishers of certain financial newsletters were not 'investment advisers.' [*Lowe*] at 211. . . . After an extensive discussion of the legislative history of the Advisers Act, the [*Lowe*] Court held that the existence of an advisory relationship depended largely on the character of the advice rendered.  Persons engaged in the investment advisory profession 'provide personalized advice attuned to a client's concerns.' *Lowe*, 472 U.S. at 208, 105 S.Ct. 2557. '[F]iduciary, person-to-person relationships' were 'characteristic' of the 'investment adviser-client relationship[].' *Id.* at 210, 105 S.Ct. 2557. . . . This type of direct relationship exists between the adviser and the fund, but not between the adviser and the investors in the fund.  The adviser is concerned with the fund's performance, not with each investor's financial performance."

*Goldstein* at 880.

      In concluding that hedge fund investors are not clients of the fund's investment adviser, the *Goldstein* court observed that an investment adviser would inevitably face a conflict of interest if the adviser had a fiduciary duty to act in the client's best interest, and fully disclose material conflicts the adviser has with its clients, to <u>both</u> the fund and the fund's investors. *Goldstein* at 881.  The Court of Appeals for the District of Columbia struck down the SEC's rule defining hedge fund investors as clients noting that while the SEC's effort to more comprehensively regulate hedge funds was understandable, it could not accomplish its objective by a "manipulation of meaning."  "The Commission has, in short, not adequately explained how

29

(1:07 CR 339)

the *relationship* between hedge fund investors and advisers justifies treating the former as clients of the latter."  *Goldstein* at 882 (emphasis added).  The Court of Appeals was unpersuaded by the Commission's position that different classes of investors may have different rights or privileges with respect to their investments because "[t]his reveals little, however, about the *relationship* between the investment and the adviser.  Even if it did, the Commission has not justified treating *all* investors in hedge funds as clients for the purpose of the rule.  If there are certain characteristics present in some investor-adviser relationships that mark a "client" relationship, then the Commission should have identified those characteristics and tailored its rule accordingly."  Goldstein at 882-883 (emphasis in original).

The facts of *Goldstein* and resulting conclusion that hedge fund investors are not clients of the fund adviser are very different than the circumstances of this case.  The characteristics defining an adviser-client relationship were determined by the *Goldstein* court to ordinarily be absent in hedge fund scenarios, i.e., the investors do not receive investment advice directly from the adviser, the investor's role is passive, the adviser has no obligation to ensure that fund investment decisions are appropriate investments for each shareholder or obligation to disclose conflicts, and the adviser's advice is not attuned to an individual investor's concerns.

In this case, there is evidence in the record that the characteristics of an adviser-client relationship were present between defendant and the OBWC regarding the ADF.  There is no dispute that the investor (OBWC) had a pre-existing fiduciary relationship separate and apart with the ADF's investment adviser (Lay).  The OBWC was Lay's client and Lay was the OBWC's investment adviser with respect to the Long/core fund, which was invested in the ADF.

30

(1:07 CR 339)

There is no evidence in the record that Lay disclosed to the OBWC any conflict of interest regarding his relationship with them vis-a-vis the ADF.  There is evidence in the record that the purpose of the OBWC's investment in the ADF was to provide Lay with flexibility and investment management alternatives for half of the Long/core fund monies in order to reduce the overall risk to OBWC monies under Lay's control.  The OBWC was the only shareholder in the ADF and all of the money invested by the OBWC in the ADF came from the Long/core fund, which was managed by the defendant.

Unlike the hedge fund investor scenario discussed in *Goldstein*, there is evidence in the record that the OBWC, as an investor in the ADF, did not have a passive role and fade into the background.  There is evidence of regular and direct communication between Lay and the OBWC regarding Lay's ADF investment decisions, the OBWC's comfort with those investments, fund performance, and the role of those investments in the OBWC's overall financial objectives with respect to OBWC monies managed by Lay.  There is evidence in the record that the purpose of the ADF investments was to benefit the OBWC - the sole shareholder - with respect to monies which Lay managed for the OBWC.

In this case, unlike *Goldstein*, there is evidence of relationship characteristics between the OBWC and Lay with respect to the Long/core fund investments in the ADF that could be found by a reasonable jury to mark a client and/or fiduciary relationship between the OBWC and Lay regarding the ADF investments.  Lay's motion for acquittal on count 1 on the grounds that the Court should have determined as a matter of law that there was insufficient evidence in the record to support a finding by the jury of a client and/or fiduciary relationship between Lay and

(1:07 CR 339)

the OBWC, and therefore insufficient evidence to sustain a conviction under

15 U.S.C. §§ 80b-6(1), (2) or (4), is DENIED.

In addition to the primary basis for Lay's motion for acquittal just discussed, Lay raises

six additional reasons for acquittal.[56]  The Court finds that when viewing the evidence in the

light most favorable to the government, there is sufficient evidence in the record from which the

jury could have found the essential elements of counts 1, 2, 3, and 4 beyond a reasonable doubt.

Therefore, defendant's motion with respect to the six additional grounds for acquittal is

DENIED.

### VII.  Defendant's Rule 33 Motion for New Trial

In addition to his arguments of insufficiency of evidence to sustain a conviction, Lay

argues that he is entitled to a new trial in the interests of justice pursuant to Rule 33 of the

---

[56] 1) The superseding indictment states that the ADF Board decided to revise the PPM language to allow leverage in excess of 150% for treasury securities, therefore there could be no violation of the leverage guidelines after May 18, 2004.  (There is evidence in the record that the proposed leverage changes were never implemented.  See Exhibit 1104-3; Testimony of T.C. Gasper, Docket No. 102, p. 75; Exhibit 1514.)
2) The OBWC violated its own investment policies and the ADF subscription agreement by investing in a hedge fund in September 2003.  (See Section VII(4))
3) There is no evidence that the OBWC either parted with property or undertook action it would not have otherwise taken absent misrepresentations or omissions by Lay, which are necessary elements of counts 2, 3 and 4.  (There is evidence in the record that the OBWC would not have transferred funds to the ADF if aware of over-leveraging.  See Testimony of T.C Gasper, Docket No. 102, p. 87.  See Exhibit 8003-3.)
4) The government's allegations in the superseding indictment and the jury charge improperly merge the roles of investor and client.  (See Section VII(1))
5) There is no evidence that the mails were used to exceed the PPM's leverage guidelines as revised May 18, 2004, which is a necessary element of Counts 1, 2, 3 and 4.  (There is evidence in the record that the mails were used in connection with over-leveraging.  See Testimony of Dominick Buonocore, Docket No. 132, p. 443; Testimony of Michael Simmerly, Docket No. 132, pp. 452-460.)
6) There is no evidence to sustain the jury's forfeiture determination.  (There is evidence in the record to support the jury's forfeiture determination.  See Exhibit 8003-3.)

(1:07 CR 339)

Federal Rules of Criminal Procedure.[57]  In particular, Lay identifies nine different factors in

support of this aspect of his motion, and contends that the cumulative effect of these factors -

rather than any single factor alone - resulted in a trial that was fundamentally unfair.[58]  These

nine factors are:

> 1. <u>Failure to instruct the jury as a matter of law
>    concerning the client investor and fiduciary duty.</u>

<u>Court's Ruling</u>:

Counsel for the government proposed an extensive recommendation as to the jury

instructions.  The defendant's request for jury instructions was limited and a copy of the

defendant's request for jury instructions is attached as Appendix 4.

The Court conducted a conference with counsel with respect to jury instructions on

October 25, 2007.  A transcript of those proceedings is in the record as Docket No. 141.  During

the October 25 hearing, the following discussion took place with respect to the defendant's

relationship to OBWC as to the MDL Active Duration Fund:

> a. The defendant's first preserved objection with respect to
>    instructions regarding client investor and fiduciary duty.[59]

_____

[57]The defendant's brief (Docket No. 113) in support of his motion for a judgment of acquittal or a new trial
is limited to a brief discussion of the motion for a new trial at pages 20 through 22.  The subsequent reply
of the defendant responding to the government's memorandum in opposition to the motion for a judgment
of acquittal or a new trial was filed on March 5, 2008.  See Docket No. 147.  The defendant's reply with
respect for the motion for a new trial was limited to the statement that "Mr. Lay reiterates the Rule 33
grounds set forth in his original motion as those stated herein."

[58]Defendant cites *Walker v. Engle,* 703 F.2d 959, 963 (6th Cir. 1983) and *United States v. Mackey,* 2007
WL 2859717 (6th Cir.) in support of his cumulative error argument.

[59]See transcript for October 25, 2007, Docket No. 141 at pp. 8 & 9.

33

(1:07 CR 339)

THE COURT:        All right.  Thank you.

Now, we have, we've discussed the charge in this case at length.[60]  Not on the record, to facilitate the discussion.  The charge as it is now, without counting the table of contents and not counting the verdict forms, is going to be approximate 93 or 94 pages long.  So it's an extraordinarily lengthy jury instruction.

And the lawyers have discussed this charge at some length, and the lawyers on both sides are entitled to register objections, if they have those objections, so they preserve them for appeal purposes in the event there is a conviction.

And I have a very strong feeling that the counsel should have every right to set forth their objections in detail, and so I'll turn first to the defendant with respect to objections that you have.  And it's my recollection that, what is at the bottom of page 36 that counsel for the defendant wanted me to add?

MR. KERGER:        Your Honor, if I might I'm concerned the pagination may change.

THE COURT:        But let me tell you where it is, because you are right, the pagination may change.  But what's now called instruction 18 at page 36

---

[60]The Court follows the practice of instructing the jury before final argument in both civil and criminal cases.  The Court attempts to avoid a lengthy delay between the end of testimony and the phase of the case involving the final instructions to the jury.  Against that background, the Court conducts an informal discussion with counsel, not on the record, with respect to the proposed jury instructions because such a process usually results in an agreement by counsel as to necessary modifications of the charge.  When it develops that there are objections that cannot be resolved, the Court then provides counsel the opportunity to place their objections on the record to preserve any issue for appeal.  The Court followed that practice in this case.

(1:07 CR 339)

says, who is a client?[61]

And then the court's proposed instruction in the fourth paragraph states: Quote, it is the defendant's position that he had two separate relationships with the OBWC.

With respect to the long fund, Mark Lay was the investment advisor to the OBWC and the OBWC was his client.

With respect to the MDL Active During Fund the defendant contends that he was the investment advisor to the MDL Active Duration Fund itself and had no investment advisor relationship with the OBWC; that is, the OBWC was not his client with respect to the OBWC's investment in the MDL Active Duration Fund."

<u>Now, as I understand, the government -- excuse me -- the defendant wishes me to add at the conclusion of that paragraph, probably another paragraph, that the OBWC, by virtue of signing a subscription agreement with the ADF, was an accredited investor of the ADF.</u>

<u>Have I correctly stated your wish?</u> (Emphasis added)

MR. SQUIRE:                   That is correct.

THE COURT:                    <u>And it's my understanding the government opposes that.</u>  (Emphasis added)

MS. PEARSON:                 That is correct, your Honor.

THE COURT:                    <u>And the court has concluded that that instruction is not required and is a matter</u>

---

[61]The Court's instruction as to "who is a client?" became Instruction 20 as contained in Appendix 3.

35

(1:07 CR 339)

<u>left to argument.  And the court will deny</u>
<u>the defendant's request.</u>  (Emphasis added)

b.      The defendant's second preserved objection with respect
        to instructions regarding client investor and fiduciary duty.[62]

MR. KERGER:          Top of the next page, your Honor.

THE COURT:           Yes, I'm just trying to find my notes here.

MR. KERGER:          Mr. Squire can give them to you if you
                     want, your Honor.

THE COURT:           Well, there was also a request, as I
                     understand it, that the paragraph on page 37,
                     the largest paragraph that begins with the
                     word "second.  You could find that the
                     government proved beyond a reasonable
                     doubt that Mark Lay did have investment
                     advisory client relationship with the OBWC
                     with respect to the OBWC's investment in
                     the MDL Active Duration Fund."

                     And then I go on to elaborate on that.

                     And it is my understanding that it's the
                     motion of the defendant that that entire
                     paragraph be eliminated.  Is that correct?

MR. SQUIRE:          No, your Honor, all that we wanted was the
                     concluding phrase after two close
                     parentheses where it says:  "or that the
                     investment adviser relationship" and those
                     words follows.

THE COURT:           Okay.  You are just objecting to what
                     follows two, which reads:  "[Therefore you
                     could find that: 1) Lay established a second
                     investment adviser-client relationship with
                     the OBWC and he was the investment

---

[62]See transcript for October 25, 2007, Docket No. 141 at pp. 9-11.

36

(1:07 CR 339)

|  | | adviser to the OBWC with respect to both the Long Fund and the MDL Active Duration Fund, or that 2)] <u>the investment advisor relationship between Lay and the OBWC regarding the Long Fund was based on the investment of monies in the Long Fund, wherever it was invested, and was not severed when Long Fund monies were invested in the MDL Active Duration Fund.</u> (Emphasis added) |

To that you take an objection?

MR. SQUIRE:        Yes sir, just that second clause.

THE COURT:         And the government's position is that it should remain?

MS. PEARSON:      Yes, your Honor.

THE COURT:         <u>I'm going to overrule the defendant's objection and continue that language in the instruction.  So that objection is also preserved for the record.</u> (Emphasis added)

c.        The defendant's third preserved objection with respect to instructions regarding client investor and fiduciary duty.[63]

MR. SQUIRE :       And, your Honor, we did propose, this may be gotten muddled in the discussion, that there should be an addition to the opening paragraph of -- that there should be about 9 or 10 words added, and I've written them out here.

MR. KERGER:       The top of page 37?

MR. SQUIRE:        At the tomorrow [sic] top of page 37.

That following the words in the first

---

[63]See transcript for October 25, 2007, Docket No. 141 at pp. 11 & 12.

37

(1:07 CR 339)

|   |   |
|---|---|
|   | paragraph MDL. |
| THE COURT: | Okay, the paragraph as its now structured is at the top of page 37, but it could change with the additions, subtractions, reads: |
|   | "It is the government's position in this case that the defendant Mark Lay had an investment advisor hyphen client relationship with the Ohio Bureau of Workers Compensation with respect to OBWC's investment in the MDL Active Duration Fund." |
|   | And then the defendant is requesting that the period where it says fund be changed to a comma, and then add "by reason of a 1998 investment advisor agreement between MDL and OBWC." |
|   | And you are asking that that language be added?[64] |
| MR. SQUIRE: | Yes sir. |
| THE COURT: | And the government's position? |
| MS. PEARSON: | Is we object, your Honor. |
| THE COURT: | Well, I agree with the government and the defendant's objection is overruled.  But it's preserved for the record. (Emphasis added) |

    d.    The defendant's fourth preserved objection with respect to instructions regarding client investor and fiduciary duty.

    A further discussion ensured during the October 25 hearing during which the defendant preserved its objection with respect to the issue of client investor and fiduciary duty in the

---

[64]The defendant's request for the additional language dealt with the first paragraph at the top of what is now page 36 and part of Instruction 20 dealing with the question of "who is a client?."

(1:07 CR 339)

dialogue beginning at Docket No. 141, page 12 line 12, through line 23 on page 13.

| | |
|---|---|
| MR. KERGER: | We object to the instruction under the subheading 15 U.S.C. Section 80b in it's entirety.[65] |
| THE COURT: | Were we modifying that? |
| MR. KERGER: | You were making additions.  You were not inclined to follow our objection, but you added language, I believe, after "in connection with that investment which arose from". |
| MS. PEARSON: | "From his status as an investment advisor with the long fund." |
| THE COURT: | And where was that phrase again? |
| MS. PEARSON: | "In connection", right after that. |
| MR. KERGER: | It's the fifth line down. |
| THE COURT: | Okay, Yeah.  And we are modifying that to |

---

[65] The Court's Instruction 21 included a section under the heading of 15 U.S.C. Section  80b-6(4) which stated in its entirety as follows:

> If you find that the Ohio Bureau of Workers' Compensation was not Mark Lay's client as an investment adviser with respect to the OBWC's investment in the MDL Active Duration Fund, then it is a question of fact for you the jury to determine whether the defendant had any fiduciary duty to the OBWC in connection with that investment <u>which arose from his status as an investment adviser in connection with the Long Fund</u>, and whether he violated that fiduciary duty.  As I instructed you above, if you determine that the defendant violated his fiduciary duty, the violation of that duty is a factor for you to consider in determining whether the government has proved beyond a reasonable doubt Element Two of Section 80b-6(4).  My instruction to you regarding Element Two of Section 80b-6(4) follows at Instruction 24.  A determination by you that Mark Lay violated his fiduciary duty is only a factor for you to consider regarding Element Two of Section 80b-6(4), and does not automatically mean that the government has met its burden of proof with respect to that element.

The defendant's objection went both to including in its entirety the instruction regarding 15 U.S.C. Section 80(b)(6)(4) and secondarily, to the underlined language.  The Court denied both objections.

39

(1:07 CR 339)

|                  |                                                                                                                                                                                                                                                                                                                                                                                                                                                       |
|------------------|-------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                  | add the phrase, I believe, that the government just related. |
|                  | You want to say that again? |
| MS. PEARSON:     | Sure.  "Which arose from his status as an investment advisor with the long fund." |
| MR. KERGER:      | And our objection would continue even with the change, your Honor. |
| THE COURT:       | The court will add that phrase, and overrules the defendant's objection.  And the defendant's objection to the inclusion -- the defendant objects to the inclusion of that phrase and also objects to the paragraph in its entirety, which has as the heading 15 U.S.C. Section 80b hyphen 6 paren 4 and begins with the phrase:  "if you find that the Ohio Bureau of Workers Compensation was not Mark Lay's client as an investment adviser with respect to the OBWC's investment in the MDL Active Duration Fund", and then it goes on. |
|                  | And you are objecting to that entire paragraph? |
| MR. KERGER:      | Yes. |
| THE COURT:       | The objection is preserved for the record and it is denied.  and the objection to adding the additional language is also denied.  and the objection is preserved for the record. |

2.   Refusal of the Court to allow impeachment of Messrs. Gasper and McLean concerning unlawful and negligent actions of the OBWC.

Court's Ruling:

The government filed a pretrial motion in limine to prevent irrelevant, confusing and

40

(1:07 CR 339)

unfairly prejudicial testimony.  See Docket No. 29.[66]  In its response (Docket No. 38), counsel

for the defendant indicated no objection to the granting of the motion as it related to any claim

that the OBWC officers were negligent.[67]  Consequently, the Court granted the government's

pretrial motion in limine and removed any possible claim by the defendant to the effect that the

issue of his guilt could in some fashion be negated by the contention that employees of the

OBWC engaged in negligence.  The Court finds that the defendant is bound by his pretrial

agreement that the issue of negligence would not be permitted during the trial.  As a result, the

second basis for a new trial is without merit and is DENIED.

> 3.    Refusal to allow use of documents related to Mr. McLean's
>        appeal to the State Personnel Board of Review to impeach him.

Court's Ruling:

The government contends that the Court correctly sustained the government's objection

to improper impeachment of its witness, James McLean.  After reviewing the transcript of

McLean's testimony at Docket No. 101, pages 185 through 188, the Court agrees and finds that

the objection is not well taken and does not justify granting the defendant's  motion for a new

trial.

> 4.    Permitting the government to constantly refer to the OBWC
>        as a victim and to its role in helping injured workers, but
>        preventing defendant from referring to the OBWC's unlawful

---

[66]Specifically, the government contended that the "jury should hear neither evidence nor argument that
OBWC may have acted negligently in monitoring the ADF and detecting the defendant's over-leveraging
of the ADF".  See Docket No. 29, page 10.

[67]The defendant's response stated "Defendant does not believe that OBWC officers were negligent.  It is
his position that they understood what was occurring and approved it.  That evidence is surely admissible,
but it also means that the defendant has no objection to granting of the motion requested by the
government regarding negligent conduct.  See Docket No. 30, pages 2-3.

(1:07 CR 339)

<u>actions, such as investing in hedge funds and crimes by its employees.</u>

Court's Ruling:

The defendant failed to introduce any evidence in support of a proposition that the decision of T.C. Gasper to approve the transfer of monies from the Long Fund or core fund under the management of Mark Lay to the ADF violated OBWC investment policies.  The Court is uncertain as to what counsel for the defendant is suggesting by saying that the Court prevented the defendant from establishing that OBWC employees committed crimes.  To the contrary, T.C. Gasper and James McLean were cross-examined about their convictions for criminal conduct while employed by the OBWC.  The fourth argument in support of a new trial is without merit and is DENIED.

> 5.  <u>Refusal to admit minutes of the August 14, 2004</u>
>      <u>meeting of the OBWC oversight committee where</u>
>      <u>Mr. McLean stated the OBWC had no hedge fund investments.</u>

Court's Ruling:

The Court has no obligation to search the record in the absence of specific direction from the party claiming error on the part of the Court that would justify granting a new trial.  The defendant's objection that the Court refused to admit the minutes of the August 14, 2004 meeting of the OBWC oversight committee is not identified in the defendant's motion.  Counsel for the government has directed the Court's attention to Docket No. 101, page 213, to the re-cross examination of McLean where the following question was asked to which an objection was made and sustained by the Court.  Specifically, the question stated "Now, focusing on the time you were seeking these reports, July, August of 2004 and the months thereafter, isn't it a fact that

42

(1:07 CR 339)

you informed the oversight commission that the Bureau was even invested in the hedge fund?"

The Court notes there is nothing in that question by counsel for the defendant which requested the Court to admit the minutes of the August 14, 2004 meeting of the OBWC oversight committee.

The Court finds that the fifth basis asserted by the defendant in support of his motion for new trial lacks merit.

> 6. Refusal to admit the 2004 version of the OBWC investment policies and guidelines authorizing hedge fund investments for the first time.

Court's Ruling:

The defendant's motion for new trial with respect to objection number six is insufficient on its face to justify consideration by the Court. The claim in support of a motion for a new trial is DENIED.

> 7. Upon reading Mark Lay's civil deposition testimony to the jury after deliberations began, refusal to give limiting instructions required by *United States v. Marwin Smith,* 419 F.3d 521 (6th Cir. 2005) cautioning the jury not to place too much emphasis on the testimony or take it out of context.

Court's Ruling:

During the government's case in chief, it presented deposition testimony of Mark Lay taken in a civil case brought by the State of Ohio against Mark Lay in Ohio's effort to recoup the losses of the OBWC. The deposition testimony included statements by Mark Lay indicating that the OBWC was his client with respect to the OBWC's investment in the ADF, the hedge fund.[68]

---

[68]The deposition in question was taken in Pennsylvania. The court reporter who took Mark Lay's deposition in the civil case, Sophia M. Smith, appeared as a government witness and testified as to what her notes regarding the testimony of Mark Lay indicated. Before her testimony commenced, it was agreed

(1:07 CR 339)

By the time of the criminal trial, Mark Lay, through his counsel had changed his position .  As a consequence, the government's request that the deposition testimony be presented to the jury was granted.  The challenged issue of the status of the OBWC as a client in connection with the ADF, in the Court's view, made the deposition testimony of Mark Lay relevant.

After the jury began its deliberations, it requested the opportunity to hear again the deposition testimony of the defendant.  The note from the jury foreman during the jury deliberations stated: "Can we see the Grand Jury testimony of Mark Lay?"  The Court then stated that it understood the jury to be asking for the deposition testimony of the defendant.  Specifically, the Court stated " After considering the objections of counsel, the Court permitted the previous deposition testimony to be read to the jury.  Specifically, Richard DelMonico, the court reporter who had transcribed the deposition testimony during the trial, testified as to what his notes stated.  Out of an abundance of caution, the Court had a second court reporter, Lori Callahan, record the testimony of Richard DelMonico who was the reporter when the Lay deposition was read during the trial.

The transcript of that proceeding demonstrates that the Court instructed the jury before it allowed the testimony to be re-read to the jury and stated:

> "Members of the jury, you requested to hear the testimony of the court reporter who gave testimony of the defendant and I have decided to permit you to hear that.  However, I advise you that you

---

that her testimony would be limited to specific questions and answers set forth in the Mark Lay deposition. The testimony of Sophia Smith respecting the specific questions and answers in the Mark Lay deposition appear at pp. 147- 170 in the transcript of the proceedings before the Court on October 24, 2007.  (Docket No. 120)

(1:07 CR 339)

are not to accord undue influence to that testimony."[69]

The substance of the seventh claim advanced in support of the motion for a new trial is that the Court refused to give limiting instructions as required in *United States v. Smith* 419 F.3d 521 (6th Cir. 2005).  The Court is of the view that its preliminary instruction prior to the re-reading of the Lay deposition during the jury deliberations did not offend *United States v. Smith*. The Court finds that the seventh claim advanced in support of the motion for a new trial is without merit.

        8.      <u>Failure to rule on objections in Mark Lay's<br>deposition prior to reading it to the jury.</u>

<u>Court's Ruling:</u>

The defendant's motion fails to direct the Court where he had requested the Court to rule on the objections in Mark Lay's deposition testimony prior to reading it to the jury.  The eighth claim in support of the motion for a new trial is without merit.

        9.      <u>Failure to advise the jury as a matter of law that<br>the PPM guidelines were revised on May 18, 2004.</u>

<u>Court's Ruling:</u>

The Court agrees with the government that the determination of whether the PPM guidelines had been revised was a fact issue left appropriately for the jury.  The ninth claim in support of a motion for a new trial is without merit.

        9a.    <u>The defendant's cumulative error claim.</u>

Finally, counsel for the defendant, in its brief statement of claims in support of its motion

---

[69]See transcript for October 30, 2007, Docket No. 151 at p. 5.

45

(1:07 CR 339)

for a new trial, concluded with the following language:

> "Errors that might not be so prejudice [sic] as to amount to a
> deprivation of due process when considered alone, may
> cumulatively produce a trial setting that is fundamentally unfair."
> Walter v. Engle, 703 F.2d 959, 963 (6th Cir. 1983).
>
> United States v. Meckey, 2007 U.S. App. Lexis (6th Cir. 2007).
> That is the case here.
>
> The errors outlined above cumulatively produced a setting that was
> fundamentally unfair to Mark Lay.
>
> A new trial is respectfully requested."

Court's Ruling:

As the Court has found without merit any of the nine claims supporting the defendant's motion for a new trial, there is no basis to consider whether the cumulative errors justified, as claimed by the defendant, a basis for a new trial.

In sum, the Court finds the defendant's motion for a new trial to be without merit and it is overruled.

**VIII.  Conclusion**

For the reasons set forth in this Memorandum Opinion, the defendant's motion for an acquittal is DENIED.  The defendant's motion for a new trial is DENIED.

The Court will proceed with the sentencing of the defendant as previously scheduled.

IT IS SO ORDERED.


  May 13, 2008                              */s/ David D. Dowd, Jr.*
Date                                        David D. Dowd, Jr.
U.S. District Judge

46